**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JANET PROTAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 07CV3139 |
| | ) JUDGE GETTLEMAN |
| DAVID BAUM and DOUGLAS BAUM, | ) MAGISTRATE JUDGE VALDEZ |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR ACCOUNTING AND OTHER RELIEF

Plaintiff Janet Protas ("Protas"), by her attorneys, Williams, Bax & Saltzman, P.C., complains of Defendants David Baum and Douglas Baum as follows:

### PARTIES

1.     Plaintiff Protas is a citizen of the State of New York.  For many years, Protas has been engaged in the business of commercial real estate development.

2.     Defendant Douglas Baum is a citizen of the State of Illinois.

3.     Defendant David Baum is a citizen of the State of Illinois.

4.     David and Douglas Baum are the sole owners of Baum Brothers, L.L.C. ("Baum Bros."), a commercial real estate development firm located in Chicago, Illinois.

### COMMON ALLEGATIONS

5.     Prior to April 1, 2002, Protas owned her own real estate development firm, JP Ventures.  At JP Ventures, Protas procured for development and managed commercial real estate properties located in, among other places, the Chicagoland area.

6.     In the fall of 2001, David and Douglas Baum, whom Protas had met while investigating a potential project in Chicago, contacted Protas about the possibility of Protas

joining them in their own real estate development business

7.     At that time, David and Douglas Baum told Protas that they had more business then they could handle. They accordingly suggested that Protas join them as partner to assist them in the development of their projects.

8.     Over the next several months, the parties discussed such an arrangement. During the course of these discussions, the only relationship discussed by the parties was a partnership arrangement between Protas and Defendants. At no time did the parties discuss Protas becoming only an employee of Defendants or their firm, Baum Bros.

9.     On March 11, 2002, David L. Baum sent Protas an e-mail containing "a draft outline for [the parties'] partnership." A true and accurate copy of David L. Baum's March 11, 2002 e-mail to Plaintiff is attached hereto as Exhibit A.

10.    Attached to the email was a two-page "Partnership Proposal." A true and correct copy of the Partnership Proposal is attached hereto as Exhibit B.

11.    Pursuant to the terms of the Partnership Proposal, Protas would become a partner starting April 1, 2002.

12.    With respect to compensation, the Partnership Proposal set forth a detailed breakdown of how Protas, Douglas Baum and David Baum would share all profits and fees earned as a result of any development project procured by any of the partners, including but not limited to any project procured by either David or Douglas Baum via their firm, Baum Bros.

13.    In particular, the Partnership Proposal provided that Protas would receive 10% of profits earned as a result of any ownership interest in a real estate development property acquired by any of the partners after April 1, 2002.

2

14.     Protas, according to the Partnership Proposal, would earn 10% of the profits regardless of whether Protas procured or personally participated in the development of the property.

15.     In addition to the base 10% share of all profits resulting from ownership, the Partnership Proposal also provided that Protas would receive: (a) an additional 3% of the profits earned if she was the "procuring cause" of the development project; and (b) a further 7% on all projects on which she served as "project manager/lead developer."

16.     The Partnership Proposal also provided that Protas would receive various percentages of the different types of fees the business may earn with respect to one of its projects, *e.g.* asset management fees, leasing fees, and sales commissions.

17.     For example, the Partnership Proposal provided that Protas would receive 10% of all asset management fees earned on a project by any partner, including but not limited to any fees earned by David and/or Douglas Baum via Baum Bros.

18.     Similarly, the Partnership Proposal provided that Protas would receive 10% of all leasing fees earned on projects where Protas served as project manager/lead developer.

19.     Shortly after her receipt of the Partnership Proposal, Protas discussed the proposed partnership terms with David and Douglas Baum. During that conversation, Protas accepted the terms of the Partnership Proposal. She agreed to discontinue her own business and instead participate in the partnership with David and Douglas Baum, including contributing any of her pre-existing projects to the new partnership.

20.     From approximately April 1, 2002 to June 1, 2006, Plaintiff and Defendants operated as a partnership pursuant to the terms of the Partnership Proposal.

3

21.     In the first few months after formation of the partnership, Protas procured a project involving the purchase and renovation into residential condominiums of a vacant building located at 23 Green Street, Chicago, Illinois (the "Green Street Property").

22.     With respect to the Green Street Property, Protas served as the project manager/lead developer.

23.     For purposes of the acquisition and development of the property, a limited liability company was formed to hold title to the property, *i.e.* 23 Green, L.L.C.

24.     Consistent with the terms of the Partnership Proposal providing that Protas would receive 10% of profits resulting from the ownership interest of the partnership in a property, the terms of the operating agreement of 23 Green, L.L.C., provided that Protas received a 10% interest in the limited liability company. A true and correct copy of the Amended and Restated Operating Agreement of 23 Green, L.L.C. is attached hereto as Exhibit C.

25.     Completion of the development and the sale of the last condominium unit occurred in May of 2006. In total, the development resulted in a net profit of $2,335,147.00 to the partnership.

26.     Consistent with the parties agreement, Protas received 10% of the profits resulted from the ownership of the Green Street Property.

27.     In addition, and as required by the terms of the parties' Partnership agreement (as memorialized in the Partnership Proposal), Protas also received an additional 3% and 7% of the profits (*i.e.* for total of 20% of the profits) because she served as procuring cause and project manager/lead developer. The remaining 80% of net profits ($1,868,117.00) went to Defendants.

28.     In approximately November 2002, the partnership purchased a strip mall known

4

as Pebblewood Plaza located in Naperville, Illinois (the "Pebblewood Property").

29.　　As before, a limited liability company, Baum Pebblewood LLC, was formed to hold title to the property.

30.　　Consistent with the terms of the Partnership Proposal, Protas received a 10% interest in the limited liability company. *See* Baum Pebblewood LLC Operating Agreement, a true and correct copy of which is attached hereto as Exhibit D.

31.　　The partnership owned and managed the Pebblewood Property for approximately three years. Protas was the individual principally responsible for managing the Pebblewood Property.

32.　　During that three-year period, the partnership earned asset management fees and leasing commissions resulting from its operation of the strip mall.

33.　　As required by the Partnership Proposal, Protas received 10% of the fees earned.

34.　　In May 2006, the Pebblewood Property was sold.

35.　　Consistent with the terms of the parties' agreement, as memorialized in the Partnership Proposal, Protas received 10% of the profits earned by the partnership from the sale.

36.　　In May 2006, Protas requested from David and Douglas Baum information regarding other projects brought in by either individual so she could determine her percentage of profit due her pursuant to the parties' agreement.

37.　　For example, among other projects, Protas knew that in 2005, David and Douglas Baum had purchased a mall in Idaho known as the Karcher Mall and subsequently sold it for a profit of approximately $5,000,000. Protas, as provided by the terms of the partnership agreement, was entitled to 10% of any profits earned as a result of the sale of the Karcher Mall

property.

38.     David and Douglas Baum, however, refused to provide any information regarding

that project or any project that had been procured while Protas was a partner other than the

projects on which Protas was primarily responsible and already directly involved (*i.e.* the

Pebblewood Property and the Green Street Property).

39.     Protas left the partnership on June 1, 2006.

40.     On September 20, 2006, Protas requested, pursuant to the Illinois Uniform

Partnership Act, 850 ILCS 205/19, that David and Douglas Baum provide financial records

regarding all of the projects of the partnership.

41.     In response to Protas' requests to inspect the financial records of the partnership,

David and Douglas Baum have refused to provide any records.

## COUNT I
### (Accounting pursuant to 805 ILCS 205/22 or 43)

42.     Protas realleges paragraphs 1 through 41 as Paragraph 42 of Count I.

43.     At all times relevant herein, there was in full force and effect in the State of

Illinois a certain act known as the Uniform Partnership Act, 805 ILCS 205/1 *et seq*. Section 43 of

the Uniform Partnership Act provides, in relevant part:

> The right to an account of his interest shall accrue to any partner,
> or his legal representative, as against the winding up partners or the
> surviving partners or the person or partnership continuing the
> business, at the date of dissolution, in absence of any agreement to
> the contrary.

805 ILCS 205/43.

44.     Section 22 of the Uniform Partnership Act also provides that:

> Any partner shall have the right to a formal account as to
> partnership affairs:

6

(a)     If he is wrongfully excluded from the partnership business or possession of its property by his co-partners,

(b)     If the right exists under the terms of any agreement,

(c)     As provided by Section 21,

(d)     Whenever other circumstances render it just and reasonable.

45.     As the only persons with access to the books and records of the partnership, David and Douglas Baum are obligated under the Uniform Partnership Act to account to Plaintiff regarding the assets of the partnership.

WHEREFORE, Plaintiff Janet Protas respectfully prays that this Court grant the following relief:

(1)     ordering Defendants David Baum and Douglas Baum to provide Plaintiff with all books, records, documents and materials of all types pertaining to the business and projects of the partnership, including but not limited any records from Baum Bros. L.L.C. relevant thereto, from April 1, 2002 to June 1, 2006; and

(2)     ordering an accounting from Defendants David Baum and Douglas Baum to Plaintiff of all projects procured or initiated by them or Baum Bros, L.L.C. during the period the parties operated as a partnership, *i.e.* April 1, 2002 to June 1, 2006.

## COUNT II
### (Breach of Fiduciary Duty – David and Douglas Baum.)

46.     Plaintiff realleges paragraphs 1 through 41 as Paragraph 46 of Count II.

47.     As partners, Douglas and David Baum owed a fiduciary duty to Protas to exercise

the highest degree of honesty and good faith in their dealings and handling of the partnership assets. As such, Douglas and David Baum were prohibited from enhancement of their personal interests at the expense of Protas or the partnership.

47. As a partner, Protas was entitled to inspect all financial records of the partnership and Douglas and David Baum had a fiduciary obligation to provide those documents and to disclose all transactions dealing with partnership assets to her.

48. David and Douglas Baum breached their fiduciary obligations to Protas by:

a. refusing to allow Protas to inspect the partnership's financial records;

b. increasing interest expense due to payment of costs unrelated to partnership projects thereby reducing Protas' share of partnership profits; and

c. refusing to pay Protas her percentage share of fees and profits as required by the Partnership agreement.

49. As a direct and proximate result of David and Douglas Baum's breach of fiduciary duty, Protas has suffered damages. The extent and amount of Protas' damages are unknown at this time as David and Douglas Baum control access to the financial records of the partnership.

50. Defendants David and Douglas Baum's breach of their fiduciary duties were intentional, willful, deliberate and undertaken with full knowledge of its effect on Protas.

WHEREFORE, Plaintiff Janet Protas respectfully prays that this Court grant the following relief:

(1) awarding Plaintiff damages equal to her percentage share of fees and/or profits earned on all partnership projects as provided in the Partnership agreement;

8

(2)     awarding Plaintiff her costs in bringing this action, including attorneys'
        fees;

(3)     awarding Plaintiff exemplary damages for Defendants' intentional and
        willful breaches of their fiduciary duties to Plaintiff; and

(4)     awarding Plaintiff such other relief as this Court deems just.


                            Respectfully submitted,

                            JANET PROTAS

                    By:     _____
                            One of Her Attorneys


Douglas W. Bax
WILLIAMS, BAX & SALTZMAN, P.C.
20 North Wacker Drive
Suite 3230
Chicago, Illinois 60606
(312) 372-3311

9



**Janet Protas**

**From:**        David L. Baum
**Sent:**        Monday, March 11, 2002 4:46 PM
**To:**          jprotas@jpventures.com
**Cc:**          doug@baumrealty.com
**Subject:**     Partnership Outline

**Attachments:**     JANETPROTUS-PROPOSAL.doc



JANETPROTUS-P
OPOSAL.doc (23 K
Janet:

Please find attached a draft outline for our partnership.  It probably requires a fair bit of explanation.  Please call
so we can go over it.
 Thanks.

David L. Baum
BAUM REALTY GROUP, INC.
1030 W. Chicago Avenue, Ste. 300
Chicago, Illinois 60622
david@baumrealty.com
312-666-3000 x221 (phone)
312-666-7970 (fax)
www.baumrealty.com

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.394 / Virus Database: 268.7.3/350 - Release Date: 5/28/2006

1



**Janet Protas: Partnership Proposal**

Start Date:                4/1/02

Draw:                      $30,000 to be paid as salary, less taxes, or as draw vs. share of fees

Medical Insurance Costs: $2,785.44/year, (insurance company requires you to be a salaried
                         employee to be on the plan)

Dental Insurance Costs:    $264/year, available only if salaried employee

401K Plan:                 Available only if salaried employee can contribute 15% of gross
                           income

Cellular Phone:            supplied by Baum

Office Space/Supplies:     supplied by Baum

JP Pre-Existing Deals:     Baum will receive a __% on any income or ownership generated
                           from pre-existing deals as follows:
                                   Texas Tycoon ___%
                                   Randolph Street ___% (we need to consider the full
                           ramifications of this deal – let's discuss)
                                   Erie/Orleans ____%

Baum Pre-Existing Deals: JP may be compensated for working on existing Baum deals on a
                         case-by-case basis, to be negotiated, as follows:
                                   Riverdale
                                   School/Henderson
                                   2230 S. Michigan Avenue
                                   13965 Chinden Blvd.
                                   1000 Broadway
                                   760 N. Ogden
                                   4805 S. Ashland

Profit Sharing:
   Asset Management Fees:  10% of fees generated during employment tenure
   Development Fees:       10% on all fees generated
   Ownership:              10% of Baum "developer % ownership"
                           3% additional if JP is procuring cause
                           7% additional if JP is project manager/lead developer

   Construction Management: 10% on all fees generated if JP is project manager/lead
                            developer
   General Contracting:     10% on all fees generated if JP is project manager/lead
                            developer

| | |
|---|---|
| Leasing Fees: | 10% on all fees generated to BB if JP is project manager/lead developer, specifically excluding any fees earned by Baum Realty |
| Sales Commissions: | 10% on all fees generated to BB during employment tenure, specifically excluding any fees earned by Baum Realty |
| Referral Fees: | 10% on all fees generated to BB during employment tenure, specifically excluding any fees earned by Baum Realty |

Ownership may be in the form of an "economic interest" and shall be subject to a "buy/sell" agreement (included in the partnership agreement).

In the event Baum Brothers invests equity in deals, BB will be credited with "equity ownership" proportionally dollar-for-dollar relative to total equity. BB "equity ownership" shall be separated from the BB "developer % ownership". JP will only receive a percentage of BB "developer % ownership".

In the event Baum deems it beneficial to give ownership in deals to 3rd parties (i.e. brokers) Baum "developer % ownership" shall be reduced accordingly. JP will only receive a percentage of Baum "developer % ownership".

| | |
|---|---|
| Dissolution: | Upon dissolution of this relationship, JP will continue to have all ownership rights as per partnership agreements, but will not be entitled to any ongoing fees generated after dissolution date. |



# AMENDED AND RESTATED
# OPERATING AGREEMENT

## OF

## 23 GREEN, LLC

**TABLE OF CONTENTS**

<u>Page</u>

| | | |
|---|---|---|
| Preliminary Recitals | | 1 |
| Article 1 – Name | | 2 |
| Article 2 – Definitions | | 2 |
| Article 3 – Purpose and Powers | | 5 |
| | 3.1 | Purpose | 5 |
| | 3.2 | Powers | 5 |
| Article 4 – Names, Interests and Capital Contributions, Etc. of Members | | 5 |
| Article 5 – Articles of Organization; Term | | 5 |
| Article 6 – Principal Place of Business; Registered Agent and Registered Office | | 5 |
| Article 7 – Members' Capital Contributions and Loans | | 6 |
| | 7.1 | Capital Contributions of Original Members and Investors | 6 |
| | 7.2 | Additional Capital Contribution; Preemptive Rights | 6 |
| | 7.3 | No Right of Members to Interest on or Return of Capital Contribution | 6 |
| | 7.4 | Loans from Members and Third Parties | 6 |
| | 7.5 | No Personal Liability | 7 |
| Article 8 – Distributions | | 7 |
| | 8.1 | Operating Cash Flow and Capital Proceeds | 7 |
| | 8.2 | Capital Proceeds | 7 |
| | 8.3 | Refund of Excess Distributions | 7 |
| Article 9 – Allocations of Profits and Losses | | 7 |
| | 9.1 | Allocation of Profits | 7 |
| | 9.2 | Allocation of Losses | 8 |
| | 9.3 | Allocation among Members | 9 |
| | 9.4 | Profits and Losses | 9 |
| | 9.5 | Income Tax Status and Compliance | 9 |
| Article 10 – Books of Account, Records and Reports | | 10 |
| | 10.1 | Books and Records | 10 |
| | 10.2 | Tax Information | 11 |
| | 10.3 | Annual Accounting | 11 |
| | 10.4 | Additional Information | 11 |
| | 10.5 | Tax Matters Partner | 11 |
| Article 11 – Fiscal Year | | 12 |
| Article 12 – Company Funds | | 12 |
| Article 13 – Status of Members | | 12 |
| | 13.1 | No Personal Services or Reimbursements | 12 |
| | 13.2 | No Personal Liability | 12 |
| | 13.3 | Related Activities | 12 |
| | 13.4 | Not Employment Agreement | 13 |
| | 13.5 | Key Man Insurance | 13 |

s:\sh\lal\cl\baum\green\operating agreement

Article 14 – Appointment, and Powers, Rights and Duties, of the Manger   13
    14.1    Appointment and Term of Manager   13
    14.2    Authority of Manager   13
    14.3    Right to Carry Out Company Business   13
    14.4    Necessary Time   15
    14.5    Related Activities   15
    14.6    Dealings with Affiliates   16
    14.7    Not Employment Agreement   16
    14.8    No Personal Liability   16
    14.9    Indemnification   17
    14.10   Section 754 Election   17
    14.11   Removal of Manager   17
    14.12   Key Man Insurance   17
Article 15 – Transfer of Company Interests   18
    15.1    Restrictions on Disposition   18
    15.2    Transfers to Family Members   18
    15.3    Sale by Members   19
    15.4    Transfer by Operation of Law   19
    15.5    Payment of Purchase Price   20
    15.6    Specific Performance   21
    15.7    Further Conditions of Transfer of Interest   21
    15.8    Amendments   22
    15.9    Bound by Agreement   22
Article 16 – Dissolution of the Company   22
Article 17 – Additional Provisions Concerning Dissolution of the Company   23
    17.1    Liquidation   23
    17.2    Distribution on Liquidation   23
    17.3    Final Statement   23
    17.4    Company Assets Only   24
    17.5    Articles of Cancellation   24
Article 18 – Power of Attorney   24
    18.1    Power of Attorney   24
    18.2    Grant of Authority   25
Article 19 – Notices   25
Article 20 - Amendment of Operating Agreement; Meetings of
    and Actions by Voting Members and Managers   25
    20.1    Amendment with Consent of Voting Members   25
    20.2    Special Amendments   25
    20.3    Amendment of Articles   26
    20.4    Meetings of Voting Members and Manager   26
Article 21 – Representations of Members   27
Article 22 – Miscellaneous   27
    22.1    Determination of Accountants Billing   27
    22.2    No Partition   27
    22.3    Use of Company Assets Solely for Company   28

s:\sh\lal\cl\baum\green\operating agreement

| | | |
|---|---|---|
| 22.4 | Entire Agreement | 28 |
| 22.5 | Governing Law | 28 |
| 22.6 | Jurisdiction and Venue | 28 |
| 22.7 | Successors | 28 |
| 22.8 | Gender; Plural | 28 |
| 22.9 | Captions | 28 |
| 22.10 | Severability | 29 |
| 22.11 | Cooperation | 30 |
| 22.12 | Counterparts | 30 |
| 22.13 | Schedules | 30 |
| 22.14 | Time of Essence | 30 |
| 22.15 | No Third Party Beneficiary | 30 |
| 22.16 | Limitation of Liability | 30 |
| 22.17 | Members and Manager Not Agents of Members | 30 |
| 22.18 | Confidentiality | 31 |

| | |
|---|---|
| Agreement to Serve as Manager of 23 Green, LLC | 1 |
| Exhibit A to Operating Agreement of 23 Green, LLC | 2 |

# AMENDED AND RESTATED OPERATING AGREEMENT OF
## 23 GREEN, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") is made and entered into as of _____, 2004 by and among the following:

DAVID L. BAUM, an individual (sometimes "David" or "Member");

DOUGLAS P. BAUM, an individual (sometimes "Doug" or "Member");

JANET PROTAS, an individual (sometimes "Janet" or "Member");

and any persons who execute this Agreement and are admitted as Members of 23 GREEN, LLC, an Illinois limited liability company (the "Company"), in accordance with the provisions of this Agreement.

## PRELIMINARY RECITALS

1.    David, Doug and Zoom Investors, LLC ("Original Members") organized the Company under the provisions of the Illinois Limited Liability Company Act (the "Act") on May 16, 2002.

2.    The Original Members entered into that certain Operating Agreement of 23 Green, LLC dated as of June 6, 2002 (the "Original Agreement"), pursuant to which the Original Members had 100% of the Membership Interests and Baum Brothers, L.L.C. was the original Manager of the Company.

3.    The Articles of Organization were amended to change the Manager of the Company to Zoom Investors, LLC on February 7, 2003 and were further amended to change the Manager of the Company to Baum Brothers, L.L.C. on July 3, 2003.

4.    Zoom Investors, LLC assigned one-half of its Membership Interest in the Company to David and one-half of its Membership Interest in the Company to Doug on July 27, 2003.

5.    David and Doug have agreed to admit Janet as a new Member.

6.    David, Doug and Janet wish to amend and restate the Original Agreement in its entirety, as more fully set forth below.

NOW, THEREFORE, the parties hereto hereby AGREE to amend and restate the Original Agreement in its entirety as follows:

## AGREEMENT

## ARTICLE 1
## NAME

The name of the Company is 23 GREEN, LLC.  On notice to the Members, the Managers (named and defined below) may change the name of the Company in accordance with the provisions of the Act.

## ARTICLE 2
## DEFINITIONS

For purposes of this Agreement the following underlined terms in this Article shall have the respective meanings ascribed to them.

"Affiliate" means, when used with reference to a specified Person, (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with the specified Person, (ii) any Person which is an officer, partner or trustee of, general partner in, or serves in a similar capacity with respect to, the specified Person or of which the specified person is an officer, partner or trustee, or with respect to which the specified Person serves in a similar capacity, (iii) any Person which, directly or indirectly, is the beneficial owner of 10% or more of any class or equity securities of, or otherwise has a substantial beneficial interest in, the specified Person or of which the specified Person is directly or indirectly the owner of 10% or more of any class of equity securities or in which the specified Person has a substantial beneficial interest and (iv) any relative or spouse of the specified Person. An Affiliate of the Company does not include a Person who is a member in a limited liability company or partner in a limited partnership or joint venture with any Affiliate but who is not otherwise an Affiliate of the Company.

"Agreement" means this Amended and Restated Operating Agreement, as amended, modified or supplemented from time to time.

"Capital Account" means the account maintained by the Company for each Member which as of any given date reflects his actual Capital Contributions paid or contributed to the Company, (i) increased to reflect his distributive share of Company Profits, and (ii) decreased to reflect his distributive share of Company Losses and distributions of cash or property by the Company to it.  The Company shall maintain the Capital Accounts for its Members in accordance with the provisions of this Agreement as modified if and to the minimum extent necessary to comply with the requirements of the Code.

"Capital Contribution" means the total amount of money and/or the agreed value of other property contributed or agreed to be contributed, as the context requires, by each Member to the Company pursuant to the terms of this Agreement, including the Capital Contribution made by a predecessor holder or holders of the Interest of such Member, unless the context requires otherwise. The term Capital Contribution shall not include loans or other payments or advances made to the Company, whether from a Member or otherwise.

s:\sh\fal\cl\baum\green\operating agreement

2

"Capital Proceeds" means cash available to the Company from a Capital Transaction or during the liquidation of the Company.

"Capital Transaction" means the sale, exchange, or other disposition, or financing or refinancing, of Company Property other than in the ordinary course of business.

"Code" means the Internal Revenue Code of 1986, as amended, or any successor statute thereto.

"Company Property" means all assets of the Company.

"Interest" or "Membership Interest" means the ownership interest, expressed as a percentage (based on the Member's interest in the residual profits and losses of the Company), of a Member in the Company at any particular time, including the right of such Member to any and all benefits to which such Member may be entitled as provided in this Agreement and in the Act, together with the obligations of such Member to comply with all the terms and provisions of this Agreement and of the Act.

"Interest Holder" means a person who owns an Interest, either as a Member or as an unadmitted assignee or successor of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events: (i) the Member makes an assignment for the benefit of creditors; (ii) the Member files a voluntary petition of bankruptcy; (iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding; (iv) the Member files a petition seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; (v) the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties; (vi) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v); (vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated; (viii) if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property; (ix) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust; (x) if the Member is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company; (xi) if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or (xii) if the Member is an estate, the distribution

by the fiduciary of the estate's entire interest in the Company. As used in this Agreement, the term "bankruptcy" includes any case, chapter or proceeding under any chapter or section of Title 11 of the United States Code and any similar or replacement statute.

"Manager" or "Managers" means the person or persons from time to time appointed as Manager of the Company by the Voting Members pursuant to Article 14.

"Member" means each of the Voting Members and Preferred Members and any Person who subsequently signs this Agreement and is admitted as a member of the Company.

"Net Capital Contributions of Preferred Members" means the Capital Contributions of the Preferred Members minus the sum of all distributions to them in excess of their Preferred Return.

"Operating Cash Flow" means cash available to the Company from the operation of its business exclusive of Capital Proceeds.

"Organizational Expenses" means those expenses incurred by the Company in connection with and/or in contemplation of the organization and reorganization of the Company.

"Person" means any individual and any limited liability company, partnership, corporation, trust or other entity.

"Preferred Member" means any Member who is entitled to a preferred return under Sections 8.1 and 8.2 below. Preferred Members shall have no voting rights under this Agreement.

"Preferred Return of Preferred Members" means a return of twelve percent (12%) a year on the average Net Capital Contributions of Preferred Members during the year, with the average determined by dividing the Net Capital Contributions of Preferred Members as of the first day of each month during the year by the number of months in the year.

"Voluntary Withdrawal" means a Member's dissociation with the Company by means other than by a voluntary disposition of its Interest or an Involuntary Withdrawal.

"Voting Member" means a Member who is not a Preferred Member.

### ARTICLE 3
### PURPOSE AND POWERS

3.1 **Purpose**. The sole purpose of the Company is to acquire, own, hold, maintain, operate and sell units in the building known as 23 Green Street, Chicago, Illinois (the "Property"), together with such other activities as may be necessary or advisable in connection with the ownership of and sale of units in the Property. Notwithstanding anything contained herein to the contrary, the Company shall not engage in any business, and it shall have no purpose unrelated to the Property and shall not acquire any real property or own assets other than those related to the Property and/or otherwise engage in any activity except in furtherance of the purpose of the Company. Title to Company Property shall be held in the Company's name. As long as the Company is a party to an agreement with any holder of a mortgage on the Property, no Member shall have or hold a direct ownership interest in any property of the Company in the Member's individual name.

3.2 **Powers**. The Company has all powers of limited liability companies enumerated in the Act.

## ARTICLE 4
## NAMES, INTERESTS AND CAPITAL CONTRIBUTIONS, ETC. OF MEMBERS

The names, Interests, capital contributions, addresses, telephone and taxpayer identification numbers of the Members are set forth in Exhibit A. The Managers are authorized to amend Exhibit A from time to time to reflect changes in the information relating to the Members set forth on Exhibit A since its last amendment.

## ARTICLE 5
## ARTICLES OF ORGANIZATION; TERM

The term of the Company commenced on the filing of the Articles of Organization of the Company (the "Articles") with the Office of the Secretary of State of the State of Illinois on May 16, 2002. The term shall be perpetual, unless sooner terminated as provided in this Agreement.

## ARTICLE 6
## PRINCIPAL PLACE OF BUSINESS;
## REGISTERED AGENT AND REGISTERED OFFICE

The principal place of business of the Company shall be at 1030 West Chicago Avenue, Suite 300, Chicago, Illinois 60622 or at such other address as may become the offices of the Manager. The Registered Agent and Registered Office of the Company are Douglas P. Baum and 1030 West Chicago Avenue, Suite 300, Chicago, Illinois 60622, respectively. The Managers may change the principal office by written notice to the Members and may change the Registered Agent or Registered Office on written notice to the Members and as prescribed by the Act.

## ARTICLE 7
## MEMBERS' CAPITAL CONTRIBUTIONS AND LOANS

s:\sh\lal\cl\baum\green\operating agreement

5

7.1    **Capital Contributions of Original Members and Investors**. The Initial Capital Contributions and the Capital Account balances of the Members as of the effective date of this Agreement are as set forth on Exhibit A.

7.2    **Additional Capital Contribution; Preemptive Rights**. The Company at any time and from time to time may raise additional capital for the Company if the Managers determine that the additional capital is necessary or desirable. Before soliciting subscriptions from prospective new Members for the additional capital, the Managers shall notify the existing Members of the amount(s) of capital needed or desired and the reason for the need or desire and afford the Members an opportunity to contribute the capital on substantially the same terms and conditions as in the proposed solicitation (which may provide for priorities in respect of allocations and distributions of property and of profits and losses). Existing Members shall have the right, but not the obligation, to provide the capital in proportion to their respective Capital Contributions to the Company. They shall have fifteen (15) days from the date of the notice to them in which to notify the Managers of their desire and offer to provide the capital and an additional fifteen (15) days from the date on which the Managers notify them of the acceptance of their offer in which to contribute the capital. Failure of an existing Member to either notify the Managers or subsequently make a contribution on a timely basis shall constitute a waiver of his right to do so, but shall not relieve a Member from any responsibility he may have for failing to make an agreed contribution to the Company. If the existing Members do not contribute all the needed or desired capital, the Managers may solicit and, within six months from such solicitation, accept subscriptions from prospective new Members (including the Managers) under substantially the same terms and conditions as those provided to the existing Members. Any such solicitation which is not concluded within the six month period shall not be effected except after again complying with the provisions of this Section 7.2.

7.3    **No Right of Members to Interest On or Return of Capital Contribution**. The Members shall not have any right to demand or receive interest on their capital contributions or to the return of their Capital Contributions from the Company.

7.4    **Loans from Members and Third Parties**. The Company may borrow funds from Members (including the Managers), Affiliates of Members, and any third parties on such terms, including granting security to the lender in any or all of Company Property, as the Managers, in their sole discretion, shall from time to time determine.

7.5    **No Personal Liability**. Except as the Members have agreed or may subsequently agree, the Members shall have no personal liability for any debts or other obligations of the Company.

### ARTICLE 8
### DISTRIBUTIONS

8.1    **Operating Cash Flow and Capital Proceeds**. The Company shall disburse its available cash from Operating Cash Flow and Capital Proceeds to the Members at such times and in such amounts as the Managers may determine consistent with this Agreement. The

s:\sh\lal\cl\baum\green\operating agreement

Company shall make all such distributions to (i) Preferred Members, and (ii) except as otherwise set forth in this Agreement, Voting Members, pro rata in accordance with their respective Membership Interests. The Company shall not, however, make any distributions to Voting Members until it has made distributions to Preferred Members equal to the sum of (i) their Capital Contribution, and (ii) their Preferred Return. To the extent Operating Cash Flow is available, the Managers shall use best efforts to commence distributions to any Preferred Members within eighteen (18) months after the Preferred Member makes its Capital Contribution. The Preferred Members shall cease to be Members, and the Company shall not make any further distributions to them, once the Company has made distributions to them equal to the sum set forth above. The Company shall not pay any fee (but may pay commissions) to a Voting Member or Affiliate of a Voting Member until it has made distributions to the Preferred Members equal to the sum set forth above.

8.2    **Capital Proceeds**. The Company shall distribute Capital Proceeds to its Voting Members (i) pro rata in accordance with the positive balances in their respective Capital Accounts, and (ii) then pro rata in accordance with their respective Membership Interests, except that it shall not make any distribution of Capital Proceeds available from the financing or refinancing of property to a Voting Member who is not personally responsible for repayment of the debt if and to the extent that any other Voting Member (or an Affiliate of the Voting Member) is personally responsible for repayment (unless the distributee agrees to remit an amount equal to the distribution to the Voting Member personally liable to the extent such Voting Member is required to honor his or her liability for repayment).

8.3    **Refund of Excess Distributions**. If and to the extent required by the Code or applicable law, the Members shall be responsible for refunding prior distributions to them to eliminate any deficit balances in their respective Capital Accounts.

## ARTICLE 9
## ALLOCATIONS OF PROFITS AND LOSSES

9.1    **Allocation of Profits**. The Company shall allocate its net profits and gain from Capital Transactions for each year in the following order of priority:

9.1.1    to the extent of prior cumulative net losses and Losses on Capital Transactions allocated to the Members through the last day of the immediately preceding period, in the reverse order in which the losses were allocated;

9.1.2    to the Preferred Members in an amount equal to the excess, if any, of their cumulative Preferred Return through the last day of the period minus the sum of all prior allocations to them under this Section 9.1.2;

9.1.3    the balance, if any, to the Voting Members in proportion to their respective Membership Interests.

9.2 **Allocation of Losses**. The Company shall allocate its net losses and Losses on Capital Transactions for each year in the following order of priority:

> 9.2.1 to all Members in proportion to their respective Membership Interests until the amount so allocated to them under this Section 9.2(1) equals the amount of cumulative net profits and gains on Capital Transactions, if any, allocated to them for prior periods (as allocated in respect of the Interests through the last day of the immediately preceding period), in the reverse order in which such net profits were allocated;

> 9.2.2 to all Members in proportion to their respective Membership Interests in the Partnership, except that no loss shall be allocated to create or increase a deficit balance in a Member's Capital Account if one or more other Members then has a positive balance in his or her Capital Account.

> 9.2.3 to all Members in proportion to their respective positive Capital Account balances until no Member has a positive balance in its Capital Account;

> 9.2.4 to all Members in proportion to the amounts for which they (and their Affiliates) are personally responsible (to creditors or other Members) for payment of debts of the Company; and

> 9.2.5 to all the Voting Members in proportion to their respective Membership Interests in the Partnership

9.3 **Allocation Among Members**. The Company shall allocate all profits or losses (other than any profits or losses attributable to the sale or other disposition of Company Property) for a fiscal year allocable with respect to any Interest which may have been transferred during such year between the transferor and the transferee based upon the number of days that each was recognized (pursuant to Article 15) as the owner of the Interest, without regard to the results of Company operations during particular periods of such year and without regard to whether cash distributions were made to the transferor or transferee. The Company shall allocate all profits or losses of the Company attributable to a Capital Transaction to the recognized owners of the Interests (pursuant to Article 15) as of the day the Company realized such Profits or Losses for tax purposes.

9.4 **Profits and Losses**. "Profits" or "Losses" as used herein includes, without limitation, each item of Company income, gain, loss and deduction. The Company shall allocate any credits of the Company for a fiscal year in the same manner as Profits of the Company. It shall allocate any recapture of credits in the same manner as the Company initially allocated the recaptured credit among the Members.

9.5 **Income Tax Status and Compliance**. The Managers shall cause the Company to elect to be taxable as a partnership for Federal income tax purposes. They shall have authority, without the consent of the Members, to amend the provisions of this Article 9 relating to

s:\sh\laf\cl\baum\green\operating agreement

8

allocation of Profits and Losses among Members if the Company is advised at any time by the Company's legal counsel that such amendment(s) (hereinafter a "Regulatory Amendment") is necessary in order to comply with the provisions of the Internal Revenue Code and the regulations promulgated thereunder regarding the taxation of partnerships. Regulatory Amendments shall, to the extent possible, ensure that the cash distributions and allocations of Profits and Losses to the Members will, on a current and cumulative basis, be equal to the net amounts which would have been distributed or allocated to each Member if the Regulatory Amendment had not been made. Regulatory Amendments which are consistent with the advice of the Company's legal counsel shall be deemed to be consistent with the Manager's fiduciary obligations, and shall not give rise to any claim or cause of action by any Member.

## ARTICLE 10
## BOOKS OF ACCOUNT, RECORDS AND REPORTS

10.1    **Books and Records**.  The Company shall observe all necessary, appropriate and customary Company formalities.  The Managers shall keep, or cause to be kept, proper and complete records and books of account in which shall be entered fully and accurately all transactions and other matters relating to the Company's business as are usually entered into records and books of account maintained by persons engaged in businesses of a like character. The Company books and records of account shall be kept on the accrual basis, except as the Manager may otherwise determine.  The books and records shall at all times be maintained at the principal office of the Company in a manner permitting the assets and liabilities of the Company to be easily separated and readily distinguished from those of any other person.  They may be maintained in other than a written form if such form is capable of conversion into written form within a reasonable time.  The books and records shall be open to the inspection and examination of the Members or their duly authorized representatives during reasonable business hours.  The records maintained by the Company shall include the following: (i) a current list of the full name and last known business, residence or mailing address of each Member, in alphabetical order and setting forth the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member; (ii) a copy of the Articles, as amended or restated, together with executed copies of any powers of attorney pursuant to which any Articles or amendment has been executed; (iii) copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years; and (iv) copies of this Agreement, any amendments or restatements thereof and of any financial statements of the Company for the three most recent years.  Each Member shall have the right, upon reasonable demand and for any purpose reasonably related to the Member's interest in the Company, to obtain from the Managers from time to time the records referred to in this Section 10.1 and other information regarding the affairs of the Company as is just and reasonable.  The Managers shall furnish a list of names and addresses of all Members (including the number of Interests owned by each of them) to any Member who requests such a list in writing and who pays the costs of collection, duplication and mailing thereof.  The Company shall not commingle its assets or funds with those of any other Person.

10.2     **Tax Information**.  On or before 75 days after the end of each fiscal year, the Managers shall send to each person who was a holder of an Interest at any time during the fiscal year then ended such tax information as shall be necessary for the preparation by such holder of his federal and state income tax returns and other local tax returns.  Promptly after becoming available, the Managers shall send to each such person a copy of the Company's federal, state and local income tax returns for the each year.

10.3     **Annual Accounting**.  On or before 120 days after the end of each fiscal year, the Managers prepare (i) a balance sheet as of the end of such fiscal year and statements of income and Members' equity for such fiscal year, all of which shall be prepared in accordance with generally accepted accounting principles and shall reflect the differences resulting from the different allocations, if any, of the Profits and Losses of the Company for income tax and accounting purposes, (ii) a cash flow statement, (iii) a report summarizing the fees and other remuneration paid by the Company for such fiscal year to the Members and the Manager or an Affiliate of any one of them, (iv) a report of the activities of the Company during such fiscal year, and (v) a statement showing the amounts distributed to holders of Interests in respect of such year, which statement shall identify amounts distributed from operations during the year, and amounts from operations during the prior year.  The various statements shall be signed and certified by a Manager as true and complete or shall be accompanied by an audit report of the Company's certified public accountants.  The Managers shall, on request of the Person, and subject to the Member's obligation for advance payment under Section 10.4, send a copy of all or any one of statements to any Person who was a holder of an Interest at any time during the fiscal year then ended.

10.4     **Additional Information**.  The Company shall not have to provide any additional financial or information to a Member or in respect of the Membership Interest of the Member without advance payment for all costs and expenses incurred by the Company in furnishing the information.

10.5     **Tax Matters Partner**.  Doug shall serve as the Tax Matters Partner of the Company for all purposes pursuant to Sections 6221-6231 of the Code (or any comparable provision of any succeeding law).  The Company shall not be obligated to pay any fees or other compensation to the Tax Matters Partner in his capacity as such, provided that the Company shall reimburse the Tax Matters Partner for any and all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) sustained by it in its capacity as Tax Matters Partner.  The Company shall indemnify, defend and hold the Tax Matters Partner harmless from and against any loss, liability, damage, cost, or expense (including reasonable attorneys' fees) sustained or incurred as a result of any act or decision concerning the Company tax matters and within the scope of its responsibility as Tax Matters Partner.

## **ARTICLE 11**
## **FISCAL YEAR**

The fiscal year of the Company shall end on December 31 in each year.

s:\sh\lal\cl\baum\green\operating agreement

## ARTICLE 12
## COMPANY FUNDS

The Company shall deposit its funds in such bank account or accounts, or invest them in such interest-bearing or non-interest-bearing investments, as the Managers shall determine. All withdrawals from any of such bank accounts shall be made by any Manager or a duly authorized agent or agents of any Manager. Company funds shall not be commingled with those of any other person or entity. Company funds shall be used by the Managers only for the business of the Company.

## ARTICLE 13
## STATUS OF MEMBERS

13.1 **No Personal Services or Reimbursements**. No Member shall be required to perform services for the Company solely by virtue of being a Member. Unless approved by the Managers or as otherwise provided in this Agreement, no Member shall be entitled to compensation for services performed for the Company or for reimbursement for expenses incurred in connection with the activities of the Company.

13.2 **No Personal Liability**. No Member shall have any personal liability under this Agreement whatsoever, whether to the Company, to any of the Members or to the creditors of the Company, for the debts of the Company or any of its losses beyond its Capital Contribution.

13.3 **Related Activities**. The Members and their Affiliates (subject to any other agreements between them) may have other business interests and may engage in other activities in addition to those relating to the Company, including the ownership, operation and/or management of other and competing real estate developments and other businesses. Neither the Company nor any Member shall have, and hereby waive, any right by virtue of this Agreement or the Company relationship created hereby in or to such other ventures or activities or to the income or proceeds derived therefrom, even if the business of such ventures shall compete with the business of the Company, and the pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper. No Member or Affiliate of a Member shall be obligated to present any particular investment opportunity to the Company or the Members even if such opportunity is of a character which, if presented to the Company or Members, could be taken by it or them, and each Member shall have the right to take for his own account (individually or otherwise) or to recommend to others any such particular investment opportunity.

13.4 **Not Employment Agreement**. The Members hereby recognize and confirm that: (1) nothing in this Agreement shall constitute an agreement of the Company, a Member or any Affiliate of either to employ or otherwise engage or continue to employ or otherwise engage any Member as an employee, professional or consultant for any period whatsoever; and (2) the Company, the Members and their Affiliates have and shall have, and hereby expressly reserve, their respective right to terminate the services of a Member at any time and for any reason or no reason whatsoever without any liability or payment of any fee, cost or other amount for damages

s:\sh\lal\cl\baum\green\operating agreement

11

or otherwise, and each Member hereby releases any and all claims that the Member or any other person has or may have by reason of any such termination.

13.5    **Key Man Insurance**. The Members hereby authorize the Company to purchase, own and maintain insurance on their lives and/or on the lives of any member of a Member and, except as otherwise agreed, shall not have or claim any ownership or other interests in the insurance or the proceeds of the insurance.

**ARTICLE 14**
**APPOINTMENT, AND POWERS, RIGHTS AND DUTIES, OF THE MANAGER**

14.1    **Appointment and Term of Manager**. The Company shall have no more than three Managers, with David, Doug and Janet serving as the initial Managers. A Manager shall continue in office as such until his or her resignation, removal or inability to act. A Manager need not be a Member of the Company.

14.2    **Authority of Manager**. The Managers shall have exclusive authority to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. The Managers shall have all the rights and powers of Manager as provided in the Act and as otherwise provided by law. Any action taken by any Manager shall constitute the act of and serve to bind the Company. In dealing with any Manager acting on behalf of the Company, no person shall be required to inquire into the authority of the such Manager to bind the Company. Persons dealing with the Company are entitled to rely conclusively upon the power and authority of any Manager irrespective of any limitations imposed on the Managers under this Agreement. The Managers may not do any act in contravention of this Agreement. The Managers may not do any act which would make it impossible to continue to carry out the business of the Company except as expressly provided in or permitted by this Agreement. The Managers may not possess Company Property or assign rights in the Property for other than a Company purpose.

14.3    **Right to Carry Out Company Business**. Except as may be otherwise provided in the Act or specifically provided in this Agreement, each of the Managers shall have the right, power and authority to do on behalf of the Company all things which, in his or her sole judgment, are necessary, proper or desirable to carry out the business of the Company and the duties and responsibilities of the Managers as manager of the Company including the right, power and authority to do each and all of the following, without the approval or consent of the Members:

> (i)    to acquire by purchase, lease, or otherwise, any real or personal property, tangible or intangible, or any other business organized for a purpose similar to that of the Company, and to place record title to any Company Property in its name or in the name of a nominee or a trustee for the purpose of mortgage financing or any other convenience or benefit of the Company;

(ii)     to construct, operate, maintain, finance, and improve, and to own, sell, convey, assign, mortgage, or lease any real estate and any personal property;

(iii)    to sell, dispose, trade, or exchange Company Property or appoint a Property Manager to manage any Company Property for and on behalf of the Company;

(iv)    to enter into agreements and contracts and to give receipts, releases and discharges;

(v)     to purchase liability and other insurance to protect the Company's properties and business, including insurance on the life of any Member, Manager or other individual whom the Manager regards as key to the success of the Company;

(vi)    to borrow money in the ordinary course of business and as security therefor to mortgage, pledge or otherwise encumber all or any part of any Company Property and to obtain replacements of borrowings related in any way to Company Property, and to prepay in whole or in part, refinance, recast, modify, consolidate or extend any encumbrances affecting any Company Property;

(vii)   to execute or modify leases with respect to any part or all of the assets of the Company;

(viii)  to prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or deeds of trust;

(ix)    to execute any and all other instruments and documents which may be necessary or in the opinion of the Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

(x)     to make any and all expenditures which the Manager, in his or her sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting and other related expenses incurred in connection with the organization and financing and operation of the Company;

(xi)     to establish and maintain such reserves for working capital and other purposes incident to the ownership of Company Property as the Manager from time to time may deem appropriate;

(xii)    to invest and reinvest Company reserves in short-term instruments or money market funds;

(xiii)   to employ and dismiss from employment any and all Company employees, agents, independent contractors, attorneys and accountants; and

(xiv)   to enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company.

Notwithstanding anything to the contrary set forth in this Section 14.3, no Manager shall dispose, trade, exchange, mortgage or refinance the Property or purchase any other property, or enter into an agreement to take any of such actions, without the concurrence of at least one other Manager.

14.4     **Necessary Time**.  The Managers shall devote such time to the Company business as they, in their sole discretion, shall deem to be necessary to manage and supervise the Company business and affairs in an efficient manner.  Nothing in this Agreement shall preclude the employment, at the expense of the Company, of any agent or third party to manage or provide other services in respect of Company Property subject to the control of the Managers.

14.5     **Related Activities**.  The Managers shall not be required to manage the Company as their sole and exclusive function, and the Managers (subject to any other agreements between them or with the Members) may have other business interests and may engage in other activities in addition to those relating to the Company, including the ownership, operation and/or management of other and competing real estate developments and other businesses.  Neither the Company nor the Members nor any Manager shall have, and hereby waive, any right by virtue of this Agreement or the Company relationship created hereby in or to such other ventures or activities or to the income or proceeds derived therefrom, even if the business of such ventures shall compete with the business of the Company or other businesses of the Members or Managers, and the pursuit of such ventures, even if competitive with the business of the Company or other businesses of the Members or Managers, shall not be deemed wrongful or improper.  No Manager shall be obligated to present any particular investment opportunity to the Company or the Members even if such opportunity is of a character which, if presented to it or them, could be taken by them, and the Manager shall have the right to take for his or her own account (individually or otherwise) or to recommend to others any such particular investment opportunity.

14.6     **Dealings With Affiliates**.  The validity, enforceability and/or rights and obligations of or under any transaction, agreement or payment involving the Company and any Manager or Member or an Affiliate of either shall not be affected by reason of the relationship between the Company or the Manager or Member or Affiliate as long as the transaction, agreement or payment is consented to or approved of by the Managers.  Any Affiliate may

s:\sh\lal\cl\baum\green\operating agreement

14

supply goods and services to the Company on terms and conditions which are no less favorable to the Company than those available to the Company in similar dealings with unaffiliated third parties. If the Company has obtained a "key-man" or other life insurance policy on the Manager or Member or Affiliate of either, the Company may, if the Managers determine that such insurance is no longer necessary or desirable, assign such policy to the insured or the Member or Affiliate of a Member (as the Managers determine) for an amount equal to the cash surrender value, if any, of the policy.

14.7 **Not Employment Agreement**. Each Manager hereby recognizes and confirms that: (1) nothing in this Agreement shall constitute an agreement of the Company or any Member or Affiliate of either to employ or continue to employ the Manager as an employee for any period whatsoever; and (2) the Company, the Members and their Affiliates have and shall have, and hereby expressly reserve, their respective right to terminate a Manager from employment at any time and for any reason or no reason whatsoever without any liability or payment of any fee, cost or other amount for damages or otherwise, and each Manager hereby releases any and all claims that the Manager or any other person has or may have by reason of any such termination of employment.

14.8 **No Personal Liability**. No Manager shall be liable, responsible or accountable in damages or otherwise to the Company or to any Member for any action taken or failure to act on behalf of the Company within the scope of the authority conferred on the Managers by this Agreement or by law unless such action or omission was performed or omitted fraudulently or in bad faith or constituted gross negligence. Anything herein contained to the contrary notwithstanding, except in the case of fraud, misrepresentation of material facts, bad faith, gross negligence or intentional torts or breach of this Agreement, no Manager shall be liable to any Member, or to the Company, nor shall the Company, or any Member, make a claim against the Manager.

No Manager shall have any personal liability whatever, whether to the Company, to any of the Members or to the creditors of the Company, for the debts of the Company (including debts arising from an obligation to purchase Interests under this Agreement) or any of the Losses of the Company.

14.9 **Indemnification**. The Company shall indemnify, defend and hold harmless each Manager from and against any loss, expense, damage or injury suffered or sustained by him or her by reason of any acts, omissions or alleged acts or omissions arising out of his or her activities on behalf of the Company or in furtherance of the interests of the Company, including any judgment, award, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, provided that the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claims are based were in good faith and were not performed or omitted fraudulently or in bad faith or as a result of gross negligence by the Manager. Such indemnification shall be made only to the extent of the assets and rights of the Company. The Company may, in accordance with and subject to compliance with the Act, including receipt of an undertaking for reimbursement of funds if and when required, advance funds to the Manager

s:\sh\lal\cl\baum\green\operating agreement

15

in respect of any item for which a party is indemnified under this Section 14.9. Each Manager shall promptly notify the Members of any request for, and payment or advance of, any funds to any party under this Section 14.9. Each Manager shall constitute an indemnified party under this Section 14.9 with respect to any guaranty by him or her of any loans or borrowings described in Section 14.3(vi).

14.10 **Section 754 Election**. The Managers may, in their sole discretion, make or revoke the election referred to in Section 754 of the Code or any successor provision. Each Member shall, upon request of the Managers, supply the Managers with the information necessary to properly give effect to the election.

14.11 **Removal of Manager**. Voting Members holding at least seventy-five percent (75%) of the Interests in the Company then owned by Voting Members may at any time remove a Manager with or without cause or reason and without any liability to such Manager and appoint a new Manager to fill the vacancy.

14.12 **Key Man Insurance**. The Managers shall, in acting as such, authorize the Company to purchase, own and maintain insurance on the life of a Manager and shall not have or claim any ownership or other interests in the insurance or the proceeds of the insurance.

## ARTICLE 15
## TRANSFER OF COMPANY INTERESTS

15.1 **Restrictions on Disposition**.

(a) As used in this Article: the term "dispose" and all variants thereof shall include the making or effecting of any inter-vivos or testamentary gift, transfer, assignment, sale, conveyance, transfer by reason of intestacy, pledge, hypothecation, encumbrance, attachment, seizure and sale by legal process, and any other transfer by act of a Member or by operation of law; and the disposition of an interest in a Member to, or in trust for, a Person who is not a Member, or a member of the Member, shall be deemed to be a disposition of an Interest in the Company.

(b) No Member shall have the right or power to Voluntarily Withdraw from the Company; and any Member who shall attempt to voluntarily withdraw shall be in intentional breach of this Agreement. A Member who attempts to or successfully Voluntarily Withdraws notwithstanding the provisions of this subsection shall not be entitled to receive the fair value of its Interest in liquidation of its Interest pursuant to Section 25-10 of the Act or otherwise.

(c) No Member shall dispose of its Interest or Interests except to the Company or as specifically allowed herein after first complying with the provisions of this Agreement. Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The disposition of any Membership Interests in violation of the prohibition contained in this Section 15.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom a Membership Interest is attempted to be

s:\sh\lal\cl\baum\green\operating agreement

16

transferred in violation of this Section 15.1 shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company or, to the maximum extent permitted by law, receive distributions from the Company or have any other rights in or with respect to the Interest.

(d)     Upon the death, dissolution, liquidation, termination or adjudication of incompetency of a Member, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Member (the "Successor") shall have all the rights of such Member subject to satisfying the conditions precedent under this Agreement to become a Member. The transfer of an Interest by a Successor shall be subject to the same restrictions as his or its predecessor Member.

15.2     **Transfers to Family Members**. A Member may dispose of all or any portion of his Interest to or in trust for the benefit of himself and/or one or more members of his Immediate Family. For purposes of this Section 15.2, a Member's immediate family shall be limited to his spouse, children, grandchildren and stepchildren.

15.3     **Sale by Members**.

(a)     If a Member desires to sell or otherwise transfer all or any portion of his Interest for consideration and receives a bona fide written offer therefor, he shall give written notice thereof to the Manager and shall offer the Interest to the Company at the price at which he proposes to dispose of such Interest. The notice and offer shall be in writing and shall state the name and address of the proposed transferee, the Interest to be transferred, the intended manner of disposition and the proposed disposition price.

(b)     Within the thirty day period following the receipt by the Manager of the above notice and offer, the Company shall have the option to purchase, at the above applicable price and terms, any or all of the Interest offered, exercisable by giving written notice of the exercise to the Member within the thirty day period.

(c)     If the Interest which is subject to a right to purchase in the Company by reason of this Section 15.3 is not so purchased, such unpurchased Interest may be retained by the Member or may be sold by him or her in accordance with the notice of intended disposition referred to in (a) above, subject to the other provisions of this Article 15. An intended disposition which is not concluded within three months after the Company's rights to purchase expire may not be effected except after again complying with the provisions of Article 15.

15.4     **Transfer by Operation of Law**.

(a)     Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become the holder of an Interest (an "Interest Holder") but shall not become a Member. If the Company is continued as provided in Article 16, the successor Interest Holder shall have all the rights and obligations of an Interest Holder under Section 15.6 but neither the predecessor nor the successor Interest Holder shall be entitled to

s.\sh\lal\cl\baum\green\operating agreement

17

receive in liquidation of the Interest, pursuant to the Act, the fair market value of the Member's Interest as of the date the Member involuntarily withdrew from the Company.

(b)     In the event of the transfer of an Interest of a Member on the insolvency or bankruptcy of a Member, the Company shall have the right to purchase, and the transferee thereof, upon the Company's exercise of such right, shall sell to the Company the Interest at the lesser of (i) the book value thereof as of the last day of the fiscal quarter of the Company coincident with or immediately preceding the transfer by operation of law and (ii) the transferee's cost therefor.

(c)     The Company's right to so purchase shall be exercisable by written notice given to the transferee at any time within the 60 day period from the date on which the Company receives written notice of the transfer by operation of law or the dissolution of the Member. The notice shall specify the amount of the Interest which the Company has elected to purchase and the price applicable to the Interest.

(d)     If the Interest which is subject to a right to purchase in the Company by reason of this Section 15.4 is not so purchased, such unpurchased Interest shall, subject to the other provisions of this Article 15, be retained by the transferee(s), provided that he, it or they agree in writing to, and in any event shall, be bound by the provisions of this Article 15 and all other provisions of this Agreement.

15.5     **Payment of Purchase Price**.

(a)     The payment for any Interest purchased by the Company pursuant to Section 15.3 or 15.4 shall be made within twenty (20) days following the last date on which notice may be sent by the Company with respect to its right to purchase the Interest. In making any such payment the Company shall have the right to set off any claims against the seller against the amount of the payment (in inverse order of maturity or otherwise as the purchaser may elect). The Company shall make payment by tendering to the appropriate person a certified or cashier's check in the full amount of the sum due (net of the amount of any offset).

(b)     Closing of any purchase of Interest referred to in this Section 15.5 shall be at the office of the Company.

(c)     Upon tender of payment, the seller shall execute and deliver to the purchaser such instruments and documents as may be necessary and proper to transfer to the purchaser full and complete title to the Interests so purchased, free and clear of all liens and encumbrances.

(d)     At and as a condition of the closing, (i) the purchaser of an Interest in the exercise of a right of first refusal under this Agreement shall deliver to the seller full releases of all personal guaranties, if any, of the seller, or of any predecessor in interest of the seller, of obligations or liabilities of the Company, and (ii) the seller and purchaser and the Company (if not the purchaser) shall exchange mutual releases, releasing one another and their respective Affiliates, from any and all claims relating to the seller's (or his predecessor's) ownership of the

s:\sh\laf\cl\baum\green\operating agreement

18

Interest or arising from his position as Member, Manager, employee and/or agent of the Company and its Affiliates, except for claims asserted in writing not later than the date of closing. In addition to the foregoing, upon tender of payment, the seller shall execute and deliver to the Company or other purchaser hereunder, as appropriate, such instruments and documents as may be necessary and proper to transfer to the purchaser full and complete title to the Interest so purchased, free and clear of all liens and encumbrances. Finally, if the seller so elects, on a purchase of his Interest, at the closing, the Company shall sell to the seller any insurance policy or policies on the life of the seller or owners of the seller owned by the Company for a cash payment equal to the sum of the then cash surrender value and the amount of unearned premiums on the policy or policies.

15.6 **Specific Performance**. The parties hereto hereby declare that it is impossible to measure in money the damages which will accrue to a party hereto or to the executor or administrator of the estate (the "Personal Representative") of a decedent party by reason of a failure to perform any of the obligations under this Article 15 (other than the payment of money). Therefore, if any party hereto or the Personal Representative of a decedent Member shall institute any action or proceeding to enforce the provisions hereof, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense herein that such person has an adequate remedy at law, and such person shall not urge in any action or proceeding the claim or defense that such remedy at law exists and is adequate.

15.7 **Further Conditions of Transfer of Interest**. Anything contained in this Article 15 to the contrary notwithstanding, the assignee or other transferee of a Membership Interest shall not have the right to become a substituted Member unless the Manager or Voting Members holding at least seventy-five percent (75%) of the remaining Interests then held by Voting Members agree to its becoming a Member. Moreover, a transfer of an Interest shall be effective only if, on, subject to and in accordance with the following provisions:

(i) The parties shall execute and deliver to the Managers an instrument or instruments of assignment or transfer of the Interest in form satisfactory to the Managers;

(ii) The effective date of the transfer is the first day of the calendar quarter following the calendar quarter in which the instrument of transfer is delivered to the Managers in a form which complies with the requirements of (i) above;

(iii) The right to make the transfer or the transfer does not, in the opinion of counsel for the Company, result in the treatment of the Company as a corporation (or as an association taxable as a corporation) for purposes of the then applicable provisions of the Code;

(iv) The transfer does not, to the knowledge or belief of the Managers, violate the provisions of any applicable federal or state securities law or other law, regulation or order of any governmental agency;

(v)     The transfer is not to a minor or incompetent; and

(vi)    The transfer either is not effectuated through an "established securities market" or a "secondary market (or the substantial equivalent thereof)" within the meaning of Section 7704 of the Code unless, in the opinion of counsel for the Company, the transfer would not result in the Company being treated as a corporation or an association taxable as a corporation under the Code.

A transferee of a Member Interest who does not become a substitute Member shall as an Interest Holder be entitled to receive the distributions and allocations attributable to the Interest, but shall have no rights as a Member under this Agreement. The transferor and/or transferee of all or any portion of a Member's Interest shall pay all reasonable expenses, including attorney's fees, incurred by the Company in connection with the transfer, and until paid the Company may offset the amount due it against all future distributions in respect of the Interest transferred.

15.8    **Amendments**. Upon the effectiveness of a transfer of an Interest under this Article 15, the Managers shall, subject to the provisions of this Article 15, execute, file and record with the appropriate governmental agencies such documents (including amendments to this Agreement) as are or may be required to accomplish the substitution of the assignee as a substituted Member. The Company shall treat a person entitled to become a substituted Member (pursuant to the provisions of this Article 15) as the substituted Member with respect to the Interests assigned from the date such assignment is effective under Section 15.7 notwithstanding any time consumed in preparing and filing the necessary documents with governmental agencies necessary to effectuate the substitution.

15.9    **Bound by Agreement**. Any Person who acquires any interest in an Interest (including an Interest Holder) or is admitted to the Company as a substituted Member shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement (irrespective of whether or not the Person confirms the agreement in writing).

## ARTICLE 16
## DISSOLUTION OF THE COMPANY

The Company shall be dissolved as provided in the Act as modified by the provisions of this Agreement. The Act generally provides for the Company to be dissolved upon the first to occur of any of the following events:

(i)     the expiration of the term of the Company on December 31, 2052;

(ii)    the complete termination of the Company's direct or indirect interest in any real estate assets of the Company;

s:\sh\lal\cl\baum\green\operating agreement

20

(iii)    the unanimous written agreement of the Voting Members to dissolve the Company; and

(iv)    the Involuntary Withdrawal of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company, unless within 90 days of the event there is at least one (1) remaining Voting Member and either the Managers or the remaining Voting Members holding a majority in interest of the Membership Interests held by remaining Voting Members agree to continue the business of the Company.

The bankruptcy, death, dissolution, liquidation, termination or adjudication of incompetency of a Member shall not cause the dissolution of the Company.

## ARTICLE 17
## ADDITIONAL PROVISIONS
## CONCERNING DISSOLUTION OF THE COMPANY

    17.1   **Liquidation.**  In the event of the dissolution of the Company for any reason, the Managers shall commence to wind up the affairs of the Company and to liquidate Company Property. The Members shall continue to share Profits and Losses during the period of liquidation (including unrealized Profits and Losses on distributions in kind measured by the difference between cost and fair market value) in the same proportion as before the dissolution. The Managers shall have full right and discretion to determine the time, manner and terms of any sale or sales of Company Property pursuant to such liquidation.

    17.2   **Distribution on Liquidation.**  Following the allocation of Profit and Loss and the payment of all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Managers to set up such cash reserves as they may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds of the Company shall be distributed to the Members in accordance with the provisions of Article 8.

    17.3   **Final Statement.**  Within a reasonable time following the completion of the liquidation of Company Property, the Managers shall supply to each of the Members a statement reviewed by the Company's independent accountants which shall set forth the assets and liabilities of the Company as of the date of complete liquidation, each Interest holder's pro rata portion of distributions pursuant to Section 17.2 and the amount distributed to the Managers pursuant to Section 17.2.

    17.4   **Company Assets Only.**  Except as otherwise provided in this Agreement, each Member shall look solely to the assets of the Company for all distributions with respect to the Company and its Capital Contribution thereto and share of Profits or Losses thereof

s:\sh\lal\cl\baum\green\operating agreement

and shall have no recourse therefor (upon dissolution or otherwise) against the Managers or any other Member. No Member shall have any right to demand or receive property other than cash upon dissolution and termination of the Company.

17.5 **Articles of Cancellation.** Upon the dissolution and the completion of the winding up of the Company, the Company shall terminate and the Managers shall have the authority to execute and file in the Office of the Secretary of State of the State of Illinois Articles of Cancellation of the Company as well as any and all other documents required to effectuate the dissolution and termination of the Company.

## ARTICLE 18
## POWER OF ATTORNEY

18.1 **Power of Attorney.** The Members, by their execution hereof, jointly and severally hereby irrevocably constitute and appoint the Managers, with full power of substitution, their true and lawful attorney-in-fact, in their name, place and stead to make, execute, sign, acknowledge, record and file, on behalf of them and on behalf of the Company, the following:

(i) any articles or instruments which may be required to be filed by the Company or the Members under the laws of the State of Illinois and any other jurisdiction whose laws may be applicable;

(ii) any and all amendments of the instruments described in subsection (i) above, provided such amendments (A) are required by law to be filed, (B) are consistent with this Agreement (including, without limitation, any amendments creating new classes of Members and admitting or substituting assignees of Interests as Members or admitting or substituting successor Manager) or (C) have been authorized by the particular Member or Members;

(iii) any and all documents and instruments as the Managers, in their sole discretion, deems necessary or appropriate to effect an offering of Interests;

(iv) any and all documents and instruments as the Managers, in their sole discretion, deems necessary or appropriate to effect the transactions contemplated by Article 15; and

(v) any and all such other instruments as may be deemed necessary or desirable by the Managers to carry out fully the provisions of this Agreement in accordance with its terms.

18.2 **Grant of Authority.** The foregoing grant of authority: (i) is a Special Power of Attorney coupled with an interest, is irrevocable and shall survive the death or incapacity

s:\sh\laf\cl\baum\green\operating agreement

22

of the Member granting the power; (ii) may be exercised by the Managers on behalf of each Member by a facsimile signature or by listing all the Members executing any instrument with a single signature as attorney-in-fact for all of them; and (iii) shall survive the delivery of an assignment by a Member of the whole or any portion of its Interest.

## ARTICLE 19
## NOTICES

All notices and demands required or permitted under this Agreement shall be in writing and may be sent by United States mail, postage prepaid, to the Members at their addresses as shown from time to time on the records of the Company and shall be deemed given as of the date of mailing. Any Member may specify a different address by notifying the Manager in writing of such different address.

## ARTICLE 20
## AMENDMENT OF OPERATING AGREEMENT;
## MEETINGS OF AND ACTIONS BY VOTING
## MEMBERS AND MANAGERS

20.1 **Amendment With Consent of Voting Members.** This Agreement may be amended with the consent of the Voting Members owning at least seventy-five percent (75%) of the Interests then held by all Voting Members and the consent of the Managers.

20.2 **Special Amendments.** In addition to any amendments otherwise authorized herein (including those authorized by Articles 7, 9 and 15 hereof), this Agreement may be amended from time to time by the Managers, without the consent of any of the Members (i) to add to the representations, duties or obligations of a Manager or surrender any right or power granted to a Manager herein, for the benefit of the Members; (ii) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement; and (iii) to delete or add any provision of this Agreement required to be so deleted or added by the Staff of the Securities and Exchange Commission or other Federal agency or by a State "Blue Sky" commissioner or similar such official, which addition or deletion is deemed by such Commission, agency or official to be for the benefit or protection of the Voting Members; provided, however, that no amendment shall be adopted pursuant to this Section 19.2 unless the adoption thereof (A) is for the benefit of or not adverse to the interests of the Members; (B) is consistent with Article 13 hereof; (C) does not alter the interest of a Member in profits, losses, credits or cash distributions of the Company (except to the extent otherwise expressly permitted by the terms of this Agreement); and (D) does not, in the opinion of counsel for the Company, by its terms alter the limited liability of the Members or the status of the Company as a partnership for federal income tax purposes.

s:\sh\lal\cl\baum\green\operating agreement

23

20.3    **Amendment of Articles.**  In the event this Agreement shall be amended pursuant to this Article 20, the Managers shall amend the Articles of Organization of the Company to reflect such change if it deems such amendment of the Articles to be necessary. The Managers shall have no obligation to deliver or mail copies of any Articles of Amendment to the Members.

20.4    **Meetings of Voting Members and Manager.**

(a)    Upon the written request of any Manager or of a Voting Member holding more than thirty percent (30%) of the then outstanding Interests of the Voting Members, the Managers shall call a meeting of the Voting Members for any of the matters for which the Voting Members may vote as set forth in this Agreement or of the Managers for any purpose pertaining to the business and affairs of the Company.

(b)    Notice of a meeting of the Voting Members or Managers shall be given within five (5) days after any Manager's receipt of such request, and the meeting shall be not less than five (5) nor more than thirty (30) days after the date of notice. A notice of a meeting shall state the time, place and purpose of the meeting. The meeting shall be held by telephone conference or at the Company's principal place of business or at any other place in Chicago, Illinois designated by the Person calling for the meeting.

(c)    The Managers or Voting Members entitled to notice waives notice if the Manager or Voting Member participates in and/or is present at the meeting in person or by proxy (other than for the express purpose of objecting to the transaction of any business at the meeting because it is not lawfully called or convened) or before or after the meeting signs a waiver of the notice which is filed with the records of Voting Members' meetings. The Voting Members or Managers may vote either in person or by written proxy signed by the Voting Member or Manager or by its duly authorized attorney in fact. Unless otherwise provided in the proxy, a proxy shall not be valid for more than eleven (11) months from the date of its execution. A signed original of a proxy must be deposited with the Company in advance of any action taken by proxy.

(d)    Voting Members or the Managers may participate in and act at any meeting through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such meeting shall constitute attendance and presence in person at the meeting of the person or persons so participating.

(e)    Any action required by this Agreement or the Act to be taken at any meeting of Voting Members, or any other action which may be taken at a meeting of Voting Members, may be taken without a meeting and without a vote, if a consent in writing (which may be in counterparts), setting forth the action taken, is signed by the holders of Interests having not less than the minimum number of votes that would be necessary to authorize or

s:\sh\lal\cl\baum\green\operating agreement

24

take such action at a meeting. Except as may be otherwise provided in this Agreement or the Act, the minimum necessary of votes necessary in any instance shall be the vote of a majority of the Voting Membership Interests.

## ARTICLE 21
## REPRESENTATIONS OF MEMBERS

The Members each represent and warrant to the Company and to each other that they and their respective members have acquired their Interests and their interests in the Members, respectively, solely for their own accounts, with the intent of holding the Interests for investment only, without the intent of participating directly or indirectly in the distribution of the Interests, and that no other person or entity has any interest in their Interests or the interests in their Members.

## ARTICLE 22
## MISCELLANEOUS

22.1 **Determination of Accountants Binding.** Except as otherwise provided in this Agreement, the opinion of the independent certified public accountants retained by the Company from time to time shall be final and binding with respect to all computations and determinations required to be made under this Agreement, including without limitation allocations of profit and loss under Article 10, purchase prices pursuant to Article 15, and computations and determinations in connection with any distribution pursuant to Article 17.

22.2 **No Partition.** The Members agree that Company Property is not and will not be suitable for partition. Accordingly, each of the Members hereby irrevocably waives any and all rights that he may have to maintain any action for partition of any Company Property.

22.3 **Use of Company Assets Solely for Company**. The credit and assets of the Company shall be used solely for the benefit of the Company and shall not be transferred or encumbered or otherwise used for or in payment of any individual obligation of a Member or Manager.

22.4 **Entire Agreement.** This Agreement constitutes the entire agreement among the parties relating to the subject matter of this Agreement. It supersedes any prior agreement or understandings among them, and it may not be modified or amended in any manner other than as set forth herein.

22.5 **Governing Law.** This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the internal laws of the State of Illinois.

s:\sh\lal\cl\baum\green\operating agreement

25

22.6 **Jurisdiction and Venue**. Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court for the Norther District of Illinois or any Illinois State Court having jurisdiction over the subject matter of the dispute or matter. All Members and the Manager hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

22.7 **Successors.** Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the parties and their legal representatives, heirs, administrators, executors, successors and assigns. Any attempted assignment or other transfer of any rights or interests under this Agreement which is not permitted by this Agreement shall be null and void and of no force and effect.

22.8 **Gender; Plural.** Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

22.9 **Captions.** Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provision hereof.

22.10 **Severability.** If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision (as written or as modified by a court to the minimum extent necessary to make it enforceable to the maximum extent permitted by applicable law) to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

22.11 **Cooperation**. The Members are entering into this Agreement in a spirit of good faith and shall cooperate with one another in making effective all the terms and provisions of this Agreement. Each Member shall, on the reasonable request and at the expense of the Company or another Member as the case may be, execute, acknowledge and deliver such documents and take such other action as may be necessary or proper to render all the terms and provisions of this Agreement effective and to enable the party requesting the cooperation to exercise and enjoy the rights granted to it in or contemplated by this Agreement.

22.12 **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. In addition, this Agreement may contain more than one counterpart of the signature pages, and this Agreement may be executed by the affixing of the signatures of each of the Members to one of such counterpart signature pages; all of such counterpart

s:\sh\laf\cl\baum\green\operating agreement

26

signature pages shall be read as though one, and they shall have the same force and effect as though all of the signers had signed a single signature page.

22.13 **Schedules.** All schedules attached to this Agreement shall be incorporated in and made a part of this Agreement.

22.14 **Time of Essence**. Time is of the essence of this Agreement and all its provisions.

22.15 **No Third Party Beneficiary**. This Agreement is made by and solely for the benefit of the Members and the Manager and his successors and permitted assigns. No other Person shall have any right, interest or claim under this Agreement or shall be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

22.16 **Limitation of Liability**. All agreements of the Company other than those entered into in the ordinary course of its business shall limit the claims of third parties to the assets of the Company and expressly waive any and all rights of third parties to proceed against the Members and/or the Managers and/or his or her trustees, partners, employees and/or agents.

22.17 **Members and Manager Not Agents of Members**. This Agreement does not, and shall not be construed to, constitute any Member or Manager as the agent of a Member.

22.18 **Confidentiality**. The parties regard this Agreement, the agreements and transactions contemplated by them, the identity of the owners of the Members, and information acquired as Members and Managers, as confidential and shall not disclose any of the information except as may be required by law or is necessary to fulfill the purposes of the Company or as the parties may otherwise agree.

[The remainder of this page intentionally left blank.]

s:\sh\lal\cl\baum\green\operating agreement

27

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

_____
David L. Baum

_____
Douglas P. Baum

_____
Janet Protas

## AGREEMENT TO SERVE AS MANAGER
## OF
## 23 GREEN, LLC

The undersigned hereby agree to serve as Managers of 23 GREEN, LLC (the "Company") on the terms and provisions of the Amended and Restated Operating Agreement of the Company set forth above.

Dated as of _____, 2004.

 

 
<br>_____
<br>David L. Baum

 

 
<br>_____
<br>Douglas P. Baum

 

 
<br>_____
<br>Janet Protas

**EXHIBIT A**
**TO**
**OPERATING AGREEMENT**
**OF**
**23 GREEN, LLC**

1.    **DAVID L. BAUM**

    **Membership Interest: FORTY-FIVE PERCENT (45%)**

    **Initial Capital Contribution:** _____


2.    **DOUGLAS P. BAUM**

    **Membership Interest: FORTY-FIVE PERCENT (45%)**

    **Initial Capital Contribution:** _____

3.    **JANET PROTAS**

    **Membership Interest: TEN PERCENT (10%)**

    **Initial Capital Contribution:** _____

s:\sh\lal\cl\baum\green\operating agreement



# BAUM PEBBLEWOOD LLC
# OPERATING AGREEMENT

**This Operating Agreement** is made and entered to be effective as of November 22, 2002, by and among Baum Brothers, L.L.C., an Illinois limited liability company (**"Brothers"**) and those Members (hereinafter defined) who, from time to time, are admitted as members and are party to this Agreement.

## BACKGROUND

The Members formed Baum Pebblewood LLC, an Illinois limited liability company (the **"Company"**) with the intention that it operate under the name "Baum Pebblewood LLC " (the **"Name"**). The Members desire to adopt this Agreement as the Operating Agreement of the Company.

In consideration of the mutual covenants and agreements set forth below, the parties, desiring to continue a limited liability company pursuant to the Act (hereinafter defined) for the purposes set forth below and upon the terms and conditions set forth below, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

The terms set forth below shall have the following meanings:

(a)     **"Act"** means the Illinois Limited Liability Company Act, as amended, or any successor statute.

(b)     **"Additional Capital"** shall have the meaning ascribed to such term in **Section 4.5**.

(c)     **"Affiliate"** means, with respect to any Person, any entity controlled by such person, and, with respect to any entity, means any other entity or enterprise which controls, is controlled by or is under common control with, such entity; "control" together with other iterations of the word, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

(d)     **"Agreement"** means this Operating and Management Agreement, as amended from time to time. References to "Articles," "Sections" and subdivisions thereof refer to this Agreement.

(e)     **"Appraisal"** shall mean the procedure described in **Section 10.6** of this Agreement by which the Liquidation Value of the Interest of a Liquidating Member is determined in the event the Liquidating Member rejects Manager's determination of Liquidation Value.

(f)     **"Assessable Member"** means any Member that is not a Non-Assessable Member.

(g)     **"Assessment Share"** of a member is that Member's share of the capital requirements of the Company, expressed as a percentage, and calculated by dividing such Member's initial capital Contribution by the total Capital Contributions to the Company.

(h)     **"Bankruptcy"** means, with respect to any Member or the Company, the occurrence of any one or more of the following:  (i) the making by the Member or the Company of an assignment for the benefit of creditors; (ii) the filing of an involuntary petition seeking an adjudication of bankruptcy against such Member or the Company under the United States Bankruptcy Code, which filing is not dismissed within 60 days of the filing; (iii) the filing of a voluntary petition by the Member or the Company under the United States Bankruptcy Code; or (iv) the entry of an order, judgment or decree by a court of competent jurisdiction providing for the liquidation of the assets of the Member or the Company or appointing a receiver, trustee or other administrator of the Member's or the Company's assets which continues in effect and unstayed for a period of 60 days.

(i)     **"Brothers"** means Baum Brothers, L.L.C., an Illinois limited liability company.

(j)     **"Business"** means the acquisition and ownership of a managing member's membership interest in PropertyCo, which interest shall be as more fully set forth in the PropertyCo Agreement.

(k)     **"Capital Account"** of a Member means the sum of such Member's Capital Contributions, increased by the items of Company income and gain, and decreased by the items of Company loss and expense, allocable to such Member and by distributions to such Member under this Agreement, provided, however, that neither the reimbursement of expenses and payments of fees pursuant to **Sections 6.1** and **6.2**, nor the payment of interest on and principal of loans from Members shall be treated as distributions for the purposes of this definition.

(l)     **"Capital Contribution"** of a Member means the amount contributed in cash, plus the fair market value of any assets contributed, to the capital of the Company by the Member or by the Member's predecessor in interest, but excluding proceeds of loans from the Member.

(m)     **"Capital Interest"** of a Member means the Member's share, expressed as a percentage, of distributions of Capital Proceeds under **Section 6.5** of this Agreement, and as indicated below each Member's signature on this Agreement.

(n)     **"Capital Proceeds"** means all cash received by the Company from a capital transaction affecting the Project in the form of distributions by PropertyCo pursuant to the provisions of Section 6.4(b)(iii) of the PropertyCo Agreement.

(o) **"Capital Transaction"** means a sale, exchange or other disposition of Company assets for value, other than in the ordinary course of business, on which gain or loss is recognized by the Members for federal income tax purposes; or a refinancing of indebtedness of the Company.

(p) **"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

(q) **"Company"** means the limited liability company formed hereby.

(r) **"Company assets"** means the Company's membership interest in PropertyCo and all other property, real or personal, tangible or intangible, owned of record or beneficially, by the Company.

(s) **"Dilution Factor"** shall be a fraction, used to dilute the Capital Interests and Operating Interests of Non-Assessable Members in the event the Company requires Additional Capital, equal to the total amount of Additional Capital obtained by the Company divided by the sum of the positive balances of Unrecovered Capital of all Assessable Members immediately prior to the contribution of the Additional Capital.

(t) **"Economic Interest"** means a Member's share of the Company's profits, losses and distributions pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision regarding any matter.

(u) **"Eligible Person"** shall have the meaning ascribed to such term in **Section 9.3(a)**.

(v) **"Exercise Notice"** shall have the meaning ascribed to such term in **Section 10.2(b)**.

(w) **"Interest"** means a Member's entire interest in the Company, including the Member's Economic Interest and the Member's right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Company or the Members under this Agreement or the Act.

(x) **"Liquidating Member"** shall mean any Member whose Interest is being purchased by Manager pursuant to the provisions of **Section 10.6** of this Agreement.

(y) **"Liquidation Value"** shall mean the proceeds that a Member would receive pursuant to this Agreement if all of the Company assets were sold for their fair market value, subject to usual and customary prorations, credits and reserves for post-liquidation expenses and reasonable transaction expenses and the net proceeds of such sale were distributed in accordance with the applicable provisions of this Agreement.

(z) **"Major Decision"** shall have the meaning ascribed to such term in **Section 8.1(b)**.

(aa) **"Majority of Interests"** means, at any time, Interests which, when taken together, exceed 50% of the Interests outstanding at such time.

(bb) **"Manager"** means Brothers and its successors, as provided herein.

(cc) **"Member"** means each of the parties, excluding Manager, who are initial signatories to this Agreement and each of the parties who may hereafter become admitted as a Member under **Article X**.

(dd) **"Name"** shall mean the name under which the Company shall operate as provided in this Agreement, initially to be the name set forth in the Background statements of this Agreement.

(ee) **"Non-Assessable Member"** means any Member that is designated as such on the signature page of this Agreement.

(ff) **"Offeror"** shall have the meaning ascribed to such term in **Section 10.2**.

(gg) **"Offerees"** shall have the meaning ascribed to such term in **Section 10.2**.

(hh) **"Operating Receipts"** means all cash received by the Company as distributions from the operations of the Project by PropertyCo pursuant to the provisions of Section 6.4(a)(ii) of the PropertyCo Agreement.

(ii) **"Outsider"** means anyone not a signatory to this Agreement, except that "Outsider" shall not include any "Permitted Transferee" (as defined in **Section 10.3**).

(jj) **"Operating Interest"** of a Member means the Member's share, expressed as a percentage, of distribution of Operating Receipts under **Section 6.4** of this Agreement, and as indicated below each Member's signature on this Agreement.

(kk) **"Permitted Transferee"** shall have the meaning ascribed to such term in **Section 10.3**.

(ll) **"Person"** shall mean any natural person and any corporation, partnership, limited liability company or other entity.

(mm) **"Project"** shall mean the land and improvements, existing and future, constructed thereon, together with all appurtenant rights and interests thereto, being sometimes commonly referred to as "Pebblewood Plaza, Naperville, Illinois."

-4-

(nn) **"PropertyCo"** means Pebblewood Plaza LLC, an Illinois limited liability company.

(oo) **"PropertyCo Agreement"** means that certain Operating Agreement of PropertyCo dated as of November \_\_\_\_, 2002, including all amendments, modifications, restatements and replacements thereof.

(pp) **"Project Financing"** shall mean one or more loans, the proceeds of which are to be used to finance or refinance costs incurred in connection with the Business. Without limiting the foregoing, Project Financing may be in the nature of short-term, long-term, recourse, non-recourse, secured, mezzanine, working capital or other form.

(qq) **"Reserves"** means, for any fiscal period, amounts set aside or allocated during such period as reserves for working capital, taxes, insurance, debt service, or other costs or current or projected expenses incident to the ownership of the Project or operation of the Company's business, which amounts shall be determined by the Manager.

(rr) **"Share"** shall have the meaning ascribed to such term in **Section 4.4**.

(ss) **"Successor Corporation"** shall have the meaning ascribed to such term in **Section 10.5**.

(tt) **"Transfer"** means, with respect to an Interest, any sale, gift, assignment, distribution, conveyance, pledge, hypothecation, encumbrance or other transfer of title or beneficial interest therein, voluntary or involuntary, whether by operation of law or otherwise, and whether or not for value.

(uu) **"Transfer Notice"** shall have the meaning ascribed to such term in **Section 10.2**.

(vv) **"Unrecovered Capital"** of a Member means the excess, if any, of the aggregate Capital Contributions made by the Member over the sum of all distributions made to the Member pursuant to **Section 6.5(a)**.

## ARTICLE II
## FORMATION OF THE COMPANY

Section 2.1. **Formation.** The parties hereto shall continue the Company pursuant to the Act, and the rights and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. The Manager shall promptly prepare and see to the execution, filing and recording in the appropriate public offices of any amendment to the Certificate of Formation required under the Act and shall do all other things required for the perfection of the Company as a limited liability company and the qualification of the Company to do business as a limited liability company in Illinois and such other jurisdictions as may be necessary or appropriate.

-5-

Section 2.2.     **Name**.  The business of the Company shall be conducted under the Name or under such other name as the Manager may determine upon advice of counsel or under such assumed name as the Manager may select in accordance with the Act.

Section 2.3.     **Principal Place of Business**.  The principal place of business of the Company is 1030 West Chicago Avenue, Chicago, Illinois 60622.  The Company may change the principal office or have offices at such other place or places as the Manager may decide.

Section 2.4.     **Registered Office and Registered Agent**.  The registered agent and registered office of the Company in the State of Illinois is Douglas Baum, 1030 West Chicago Avenue, Chicago, Illinois 60622.  The Manager may, within its sole and unrestricted discretion, change any registered office or registered agent of the Company.

Section 2.5.     **Duration**.  The existence of the Company shall be perpetual, unless the Company is earlier dissolved in accordance with the provisions of this Operating Agreement or the Act.

## ARTICLE III
## BUSINESS OF COMPANY

The purpose of the Company is to (i) operate the Business, (ii) engage in any and all financing transactions which the Manager determines to be necessary or appropriate in connection with the Business, including, without limitation, encumbering Company assets, and (iii) engage in any lawful activity for which limited liability companies may be organized under the Act.

## ARTICLE IV
## CONTRIBUTIONS TO THE COMPANY; CAPITAL ACCOUNTS;
## ISSUANCE OF INCENTIVE INTERESTS

Section 4.1.     **Members' Initial Capital Contributions**.  Each Member will have an opening Capital Account equal to such Member's Capital Contributions.  Each Member shall receive Interests as provided herein.

Section 4.2.     **Capital Accounts**.  A separate Capital Account shall be maintained for each Member.  Except as otherwise required in this Agreement or the Act, no Member shall have any liability to restore all or any portion of a deficit balance in such Member's Capital Account.

Section 4.3.     **Return of Members' Contributions to Capital**.

(a)     Except as set forth in **Section 4.1**, a Member shall not receive out of the Company's assets any part of such Member's Capital Contribution until all liabilities of the Company, except liabilities to the Members on account of their Capital Contributions, have been paid and there remain Company assets sufficient to repay such Capital Contributions.

-6-

(b)    No Member shall be entitled to demand or receive assets of the Company or an apportionment thereof. A Member only has the right to receive cash in return for such Member's Capital Contribution.

(c)    No Member shall be entitled to interest on its Capital Contribution or to demand return of such Member's Capital Contribution.

Section 4.4.    **Additional Capital Contributions.**    In addition to the Members' initial Capital Contributions, if the Manager determines, at any time or from time to time, that the Company requires additional capital, the Manager shall call for such additional capital by written notice to all Members, informing them of the total amount of additional capital ("**Additional Capital**") to be raised. Each Member shall deliver an amount equal to such Member's Assessment Share of the Additional Capital within fifteen (15) days after such notice is given or made to such Member. If any Member defaults in its obligation to fully contribute such Member's Assessment Share of Additional Capital within the fifteen (15) day period described above (referred to herein as a "**Defaulting Member**"), any or all of the other Members may advance all or part of such Defaulting Member's share, except that in the event contributing Members contribute more than the Defaulting Member's shortfall, the contributing Members' contributions shall be limited so as to be in proportion to such contributing Members' Assessment Shares. If other Members fail to advance the full amount of a Defaulting Member's share, the Manager may reduce the amount of the Additional Capital by an amount equal to the portion not so advanced. Following receipt by the Company of the Additional Capital, Manager shall make the following adjustments: a) the Capital Account and Unrecovered Capital of each Member shall be increased by the amount contributed by such Member, b) the Capital Interest of each Member shall be adjusted as follows: (i) the Capital Interests of all Assessable Members shall first be increased such that the aggregate Capital Interests of the Assessable Members plus the aggregate Capital Interests of the Non-Assessable Members following dilution described in subsection (ii) below equal one hundred percent (100%) and then such Capital Interests shall be adjusted such that they are in proportion to the Capital Accounts of the Assessable Members; and (ii) the Capital Interests of each of the Non-Assessable Members shall be diluted by application of the Dilution Factor; c) the Operating Interest of each Member shall be adjusted as follows: (i) the Operating Interests of all Assessable Members shall first be increased such that the aggregate Operating Interests of the Assessable Members plus the aggregate Operating Interests of the Non-Assessable Members following the dilution described in subsection (ii) below equals one hundred percent (100%) and then such Operating Interests shall be adjusted such that they are in proportion to the Capital Accounts of the Assessable Members; and (ii) the Operating Interests of each of the Non-Assessable Members shall be diluted by application of the Dilution Factor.

Section 4.5.    **Loans by Members**. Separate and apart from contributions to the capital of the Company, a Member may make loans to the Company at any time and from time to time as and on the terms agreed upon by such Member and the Manager, provided that if any such loan is agreed to, the Company shall allow all Members to participate in such

loan in proportion to their Interests using any procedure which the Manager determines is fair to all Members.

Section 4.6.    **Project Financing**.  PropertyCo may from time to time obtain Project Financing, in such amounts and upon such terms and conditions as the Manager shall deem proper or necessary.  In the event that any such Project Financing shall require that any of the Members or any Affiliate guarantee all or any part of the repayment of debt, the Members shall make such guarantee on a several basis in proportion to the Capital Interest of each Member.  In the event a Member refuses to guarantee the repayment of its proportionate share of any Project Financing as required hereunder, that Member's Capital Interest shall be diluted in accordance with the provisions of **Section 4.4**, with the request for the Member to guarantee the Project Financing being equivalent to, for purposes hereof, the request to make an Additional Capital Contribution pursuant to **Section 4.4**.  The Members shall be advised of the terms of any such Project Financing, the requirement of a guaranty, if any, and the parties required to execute such guaranty.  To the extent that the Project Financing for any particular aspect of the Project as determined by the Manager requires a profit participation, equity percentage, percentage of gross sales or other such participation (whether the Project Financing is in the form of a loan, joint venture or other equity vehicle), each of the Members hereby agrees to the dilution and/or the subordination of their Interests, on a pari passu basis, to accommodate such Project Financing.

Section 4.7.    **Investment Purposes**.  Each Member represents and warrants to the Company that it has acquired its Interest for its own account for investment, and not with a view to the transfer, resale or distribution thereof.  No Member shall make any Assignment of its Interest in a manner which violates any federal or state securities laws or the provisions of this Agreement.  Furthermore, no Member shall raise funds for or otherwise finance any Capital Contribution in a manner which violates any federal or state securities laws.  Each Member shall indemnify and hold the Company and the other Members harmless from and against all liability, costs and expenses, including reasonable attorneys' fees incurred by the Company and such Members, as a result of a breach of the representations and warranties made in this **Section 4.7** by such Member.  This indemnification obligation is in addition to any other indemnification obligation of the Members set forth herein, and shall not be subject to any limitation on Member liability set forth herein.  Such indemnification shall survive the termination of this Operating Agreement and dissolution, reorganization or like of the Company.

### ARTICLE V
### ACCOUNTING

Section 5.1.    **Fiscal Year; Company Books**.    The fiscal year of the Company shall be the calendar year.  The books of the Company shall be kept on the basis of accounting selected by the Manager.

Section 5.2.    **Engagement of Accountants**.  The Company shall engage, at the Company's expense, such accountants as the Manager shall designate to assist in the

preparation of the Company's financial statements and to prepare the Company's income tax returns.

## ARTICLE VI
## EXPENSES AND DISTRIBUTIONS

Section 6.1.    **Organizational Expenses**.    The Manager shall cause the Company to pay all expenses incurred in connection with the organization of the Company.

Section 6.2.    **Ongoing Expenses; Fees.**

(a)    The Members shall be entitled to reimbursement for reasonable out of pocket expenses, including travel and entertainment expenses, incurred in connection with the business of the Company, provided that the expenses (i) fall within written policy guidelines which are adopted by the Manager and distributed to the Members and which are evenly applied to all Members, or (ii) are pre-approved by the Manager.

(b)    The Company shall pay all of its own expenses, including legal, accounting and other outside fees and expenses.

Section 6.3.    **Timing, Amounts and Sources of Distributions**.    Subject to the provisions of this **Article VI**, the Company may make cash distributions of Operating Receipts and Capital Proceeds to the Members in such amounts and at such time or times as the Manager may determine, including, without limitation, distributions made in respect of the estimated federal, state or local income tax liability of Members relating directly to their Interest in the Company, such distributions to be apportioned among the Members as herein provided.

Section 6.4.    **Distributions of Operating Receipts**.    Subject to **Sections 6.3**, **6.6** and **6.7**, cash distributions from Operating Receipts shall be made to the Members in proportion to their Operating Interests.

Section 6.5.    **Distributions of Capital Proceeds**.    Subject to **Sections 6.3**, **6.6** and **6.7**, cash distributions from Capital Proceeds shall be made to the Members in the following order:

(a)    among all Assessable Members, that portion of the Capital Proceeds equal to the aggregate Capital Interests of the Assessable Members, to be further distributed in proportion to each such Member's Unrecovered Capital until all of Member's Unrecovered Capital is Zero, provided if the distribution being made is less than the Unrecovered Capital of all Members, then first to the Members, excluding any Defaulting Members, in proportion to the Unrecovered Capital of each such Member and then to any Defaulting Members in proportion to the Unrecovered Capital of all Defaulting Members; and

(b)    the balance, if any, to the Members in proportion to their Capital Interests.

Section 6.6.    **Creation of Reserves.** The Manager shall have discretion to establish Reserves out of Operating Receipts and Capital Proceeds as it may determine to be necessary or appropriate for the working capital needs of the Company, anticipated capital expenditures, Company liabilities or otherwise, and to determine the appropriate levels of such Reserves and the timing of additions to and disbursements from such Reserves.

Section 6.7.    **Other Provisions Regarding Distributions.** No cash shall be distributed to any Member if such distribution (i) is not permitted under the Act or otherwise, or would constitute or result in a default, under any agreement to which the Company is a party or to which Company assets are subject, (ii) would constitute a fraudulent conveyance as against creditors of the Company or (iii) if Members holding a Majority Interest, in their discretion, determine in good faith that such distribution would not be in the best interests of the Company.

## ARTICLE VII
## ALLOCATIONS OF PROFIT AND LOSS; TAX MATTERS

Section 7.1.    **Allocations of Profit and Loss From a Capital Transaction.** Subject to the requirements of Section 704(c) of the Code, each item of income, gain, loss, deduction or credit arising out of a Capital Transaction shall be allocated among the Members as follows:

(a)    Losses shall be allocated in the following order of priority:

(i)    If the Capital Account of any of the Members is positive, then losses shall be allocated in such amounts as to cause the positive balances to be in the respective amounts (or as near thereto as possible) which the Members would receive pursuant to **Article VI** if all of the Company assets were sold for a net amount equal to the sum of the Members' Capital Accounts; and

(ii)    If the Capital Account of each of the Members is either negative or zero, then all losses shall be allocated so as to cause the Capital Accounts of the Members to be in proportion (or as near thereto as possible) to their Capital Interests.

(b)    Income or gain of the Company shall be allocated in the following order of priority:

(i)    If the Capital Accounts of any or all of the Members are negative, then first in such amounts as will increase the negative balances of the Members to zero, or if the amount of income to be so allocated is less than the sum of such negative balances, then in such amounts so as to cause the negative balances to be in the ratio (or as near thereto as possible) of their respective Capital Interests; and

(ii)     If the Capital Account of each of the Members is either positive or zero, then in such amounts as will cause the resulting positive balances to be in the respective amounts (or as near thereto as possible) which the Members would receive pursuant to **Article VI** if all of the Company assets were sold for a net amount equal to the sum of the Members' Capital Accounts.

Any portion of gain so allocated which is treated as gain from the sale of the assets of the Company which are not capital assets by virtue of the application of Section 1245 or 1250 of the Code, or any recapture of investment tax credits or other tax credits previously earned by the Company, will be allocated to the Members to whom or to whose predecessor in interest the deductions giving rise to such ordinary income were allocated, and such recaptured tax credits shall be allocated to the Members to whom or to whose predecessor in interest such credits were originally allocated. The allocations in the preceding sentence will be applied separately to each fiscal year for which the Company has deducted depreciation to which Section 1245 or 1250 applies or has earned tax credits.

Section 7.2.    **Allocations of Profit and Loss Other Than From a Capital Transaction.** Subject to the requirements of Section 704(c) of the Code, each item of income, gain, loss, deduction or credit other than from a Capital Transaction shall be allocated among the Members in proportion to their ownership interests in the Company.

Section 7.3.    **Section 704(c) Allocations.** All allocations made pursuant to Section 704(c) of the Code will be made in accordance with the traditional method with curative allocations.

Section 7.4.    **Members' Intention.**    Questions of interpretation or application of the foregoing provisions shall be resolved by reference to the intention of the Members that insofar as possible, each Member shall be allocated an amount of gain which corresponds to the amount of losses and other tax and cash benefits flowing to such Member from the Company.

Section 7.5.    **Tax Matters Partner.** The Manager is designated the "**tax matters partner**" of the Company, as defined in the Code, with all necessary authority to act as such on behalf of the Company.

## ARTICLE VIII
## MANAGEMENT

Section 8.1.    **Management by the Manager.**

(a)     Except as specifically provided in this Agreement, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and assets of the Company. Without limitation of the foregoing, subject to the restrictions set forth in **Section 8.1(b)** below, the Manager shall have the sole and exclusive authority to make all decisions, and do all things, that are required or are convenient, for the due and proper business activities of PropertyCo. The Manager shall have the sole authority

-11-

to incur obligations on behalf of or bind the Company, and no other Member or person shall either (a) have the authority to bind the Company to any obligations or (b) make any representations or engage in conduct such that a third party would or might reasonably conclude that such person has the right or authority to bind the Company. Notwithstanding the foregoing, the Manager shall be entitled to make delegations of authority to Members to the extent the Manager may deem advisable.

(b)     The following decisions as well as any decisions, consents or approvals which must be made by Members pursuant to the terms of this Agreement (each, a "**Major Decision**") shall, unless otherwise specifically provided in this Agreement, require the affirmative vote of Assessable Members holding more than 50% of the Capital Interests allocated to Assessable Members:

(i)     amendment of this Agreement if the effect of the amendment is intended to materially alter the rights or benefits of one or more Members under this Agreement and the effect of such alteration will not be shared among all Members in proportion to their relative ownership interests in the Company; and

(ii)     conversion of the Company into an other type of entity if the effect of such conversion would be to make one or more Members personally liable for the debts or obligations of the entity.

(c)     If the Manager or its successor withdraws, resigns or is dissolved, or if more than twenty-five percent of the membership interests of Manager shall at any time be vested in any person or persons other than David Baum or Douglas Baum, the Company will, automatically upon the occurrence of such event, be converted into a member managed limited liability company.

(d)     If the Company is converted into a member managed company, until such time as a new Manager is appointed, any and all powers and duties allocated by this Agreement to the Manager shall be transferred to Members holding a Majority Interest and, in such event, Members holding a Majority Interest shall have the right to appoint a new Manager who shall have all of the powers and duties allocated by this Agreement to the Manager.

Section 8.2.     **Specific Powers of Manager**.  Without limiting the provisions of **Section 8.1**, Manager is specifically authorized to take the following actions:

(a)     any amendment of this Agreement not prohibited under **Section 8.1(b)**;

(b)     admission of a new Member or issuance of Additional Interests;

(c)     calling for Capital Contributions;

(d)     converting the Company into a Successor Corporation;

-12-

     (e)     liquidating or dissolving the Company;

     (f)     merging the Company into or consolidating the Company with, any other entity; and

     (g)     causing the Company to commence any insolvency proceeding, including without limitation any proceeding under the Federal Bankruptcy Code.

Section 8.3.    **Meetings of Members.**

     (a)     Regular meetings of the Members may be held on such dates and at such times and at such location as shall be determined by the Manager. Notices of the establishment of a regular meeting schedule, and of any amendments thereto, shall be given so that all Members which were not present at the meeting at which such schedule or amendment was adopted or which did not execute the written consent by which such schedule or amendment was adopted receive at least 10 days advance written notice of each meeting scheduled or rescheduled by such schedule or amendment. No other notice of such regular meetings need be given.

     (b)     Special meetings of the Members may be called by the Manager. Any such meeting shall be held on such date and at such place within 50 miles of the principal office of the Company as the Manager shall specify in the notice of a meeting, which shall be delivered to all Members at least three days prior to such meeting. Neither the business to be transacted at, nor the purpose of, such special meeting need be specified in the notice (or waiver of notice) of such meeting. All Members receiving notice of a meeting shall use their best efforts to attend the meeting.

     (c)     A Majority Interest (represented either in person, by conference telephone or by written proxy) shall constitute a quorum for the transaction of business at any meeting of the Members.

     (d)     Each Member, with respect to any vote, consent, or approval that such Member is entitled to cast or grant pursuant to this Agreement, may cast, grant or withhold such vote, consent or approval in its sole and absolute discretion, with or without cause, and subject to such conditions as it shall deem appropriate.

     (e)     Whenever the vote of Members is required or permitted to be taken in connection with any action, in lieu of such vote at a meeting, the action to be authorized or adopted may be authorized or adopted by the written consent of the Assessable Members having not less than the percentage of ownership of the Company required to approve such action if a meeting were held, so long as prompt notice of the adoption of an action or measure by written consent shall be transmitted to all Members not a party to such consent.

Section 8.4.    **Bank Accounts**. The Manager may from time to time open bank accounts in the name of the Company, and the Manager shall approve who shall be signatories thereon.

Section 8.5. **Certain Limitations of the Managers' Authority**. The Manager may approve contracts between the Company and a Member or an Affiliate of a Member, provided, that any such contract shall be on terms and conditions which the Manager believes to be consistent with prevailing practices in the marketplace.

Section 8.6. **Devotion of Time to Company**. The Manager shall not be required to manage the Company as its sole and exclusive function, and the Manager may have other business interests and may engage in other activities. Neither the Company nor any Member shall have any right by virtue of this Operating Agreement to share or participate in the other investments or activities of any other Member or to the income or proceeds derived therefrom, and any such Member shall not incur any liability to the Company or to any of the other Members as a result of engaging in any other business or venture.

## ARTICLE IX
## LIABILITIES; INDEMNIFICATION

Section 9.1. **Limitation of Liability**. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law. A Member who receives a distribution or the return in whole or in part of its Capital Contribution is liable to the Company only to the extent provided by the Act.

Section 9.2. **Liability for Certain Acts**. Each Member shall perform its duties as a Member in good faith, in a manner such Member reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Member shall not be liable to the Company or to any other Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by such Member. A Member who knowingly receives a distribution made by the Company which is either in violation of this Agreement, or at a time when the Company is insolvent, is liable to the Company for the amount of such distribution. Except as otherwise expressly set forth herein, no Member shall be required to (a) make any Capital Contributions, (b) make any loan, (c) cause to be loaned any money or other assets to the Company or (d) be personally liable for any obligation of the Company.

Section 9.3. **Indemnification of the Members**. The Company shall:

(a) indemnify, to the fullest extent permitted by the Act, any Member ("**Eligible Person**") who was or is a party or is threatened to be made a party to any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that such person is or was a Member, employee, consultant, or agent of the Company, or is or was serving at the request of the Company as a director, partner, officer, employee, consultant, or agent of another corporation, partnership, joint venture, limited

liability company, trust or other enterprise, against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such claim, action, suit or proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe such person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful; and

(b) indemnify any Eligible Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that such person is or was a Member, officer, employee, consultant, or agent of the Company, or is or was serving at the request of the Company as a director, partner, officer, employee, consultant, or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees) actually and reasonably incurred by such person in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Company and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Company unless and only to the extent that the court in which such action or suit was brought shall determine upon application that despite the adjudication of liability such person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper; and

(c) indemnify any Eligible Person against expenses (including attorneys' fees) actually and reasonably incurred by such Eligible Person, to the extent that such Eligible Person in his or its capacity as Member, officer, employee, consultant, or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in this **Section 9.3** in defense of any claim, issue or matter therein; and

(d) pay in advance expenses incurred by any Eligible Person in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Eligible Person to repay such amount if it shall ultimately be determined that such Eligible Person is not entitled to be indemnified by the Company as authorized in this **Section 9.3**; and

(e) not deem the indemnification and advancement of expenses provided by, or granted pursuant to, the foregoing to be exclusive of any other rights to which the Eligible Person(s) seeking indemnification or advancement of expenses may be entitled under any agreement, vote of the Members or otherwise, both as to action in such Eligible Person's official capacity and as to action in another capacity while holding such position; and

-15-

(f)     have power to purchase and maintain insurance on behalf of any person who is or was a Member, officer, consultant, employee or agent of the Company, or is or was serving at the request of the Company as a director, officer, consultant, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Company would have the power to indemnify such person against such liability under the provisions of this **Section 9.3**; and

(g)     deem the provisions of this **Section 9.3** to be a contract between the Company and each Eligible Person, or any appropriately designated employee or agent who serves in such capacity at any time while this **Section 9.3** is in effect and any repeal or modification of this **Section 9.3** shall not affect any rights or obligations then existing with respect to any state of facts then or theretofore existing or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon such state of facts.

Section 9.4.     **Indemnification of Other Persons**.  The Company may, but shall not be obligated to, extend all or any portion of the provisions of **Section 9.3** to any or all of its employees or agents or persons serving as officers, employees and agents for its Affiliates to the extent they are not covered by **Section 9.3**.

## ARTICLE X
## MEMBERS

Section 10.1.     **Transfer Generally**.  Subject to **Section 10.2**, no Member may Transfer its Member Interest without the prior written consent of the Manager (or Members holding a Majority Interest excluding the transferring Member(s) and any transferee Member(s) if the Manager is a transferring Member or a transferee Member).  Any person admitted to the Company as an additional Member and any transferee of an Economic Interest under this **Article X** shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement.

Section 10.2.     **Transfer of Interests to Outsiders**.

(a)     Subject to **Section 10.3**, if any Member (the **"Offeror"**) shall desire to Transfer such person's Interest or any interest therein, provided that the Offeror shall have first obtained the written consent of the Manager, the Offeror, shall serve a written notice (a **"Transfer Notice"**) to the Members and the Company (collectively, the **"Offerees"**) setting forth the following:

(i)     The intention of the Offeror to Transfer its Member or Economic Interest to an Outsider and the portion of its Interest proposed to be sold;

-16-

(ii)     The name, address and amount of all consideration offered by the Outsider for such Interests (valuing all non-cash consideration at fair market value) and the terms and conditions of such offer;

(iii)     A photocopy of a binding written offer from the Outsider and all correspondence and other documents relating to the proposed Transfer; and

(iv)     An offer by the Offeror to sell its Member or Economic Interests to the Offerees at the bona fide consideration proposed by or for the Outsider (on the same terms and conditions as offered by the Outsider unless such terms and conditions cannot be performed by the Offerees, in which case, on terms rendering comparable value).

(b)     The Members (other than the transferor Member(s)), in proportion to their relative holdings of Member Interests, shall have the first option to purchase the Interests offered for sale on the terms and conditions specified in the Transfer Notice. Such option may be exercised by serving notice on the Offeror (with copies to the remaining Offeree(s)) within 30 days after the date the Transfer Notice is received. Such notice (an **"Exercise Notice"**) shall indicate the percentage of Member or Economic Interests with respect to which such option is being exercised.

(c)     If such Members have not exercised their option to purchase all of the Interests offered for sale in the Transfer Notice within such 30-day period, then the Members exercising their option pursuant to the Exercise Notice shall then have the option to purchase any remaining Interests in proportion to the acceptances set forth in their Exercise Notices. Such option may be exercised within 45 days of the giving of the Transfer Notice. If any Interests remain not subject to an acceptance after such 45-day period, the Company shall have the next option to purchase the Interests offered for sale (or the portion thereof with respect to which such option has not been previously exercised) by serving an Exercise Notice on the Offeror (with copies to the remaining Offeree(s)) within 60 days after the Transfer Notice was received.

(d)     If the Offerees shall not have exercised their option to purchase all of the Interests offered for sale in the Transfer Notice within such 60-day period, then the Member or Economic Interest holder giving the Transfer Notice may sell its Interests to the Outsider on the terms set forth in the Transfer Notice (subject to the required consent for Member Interests), with such sale to close no later than 90 days after the giving of the Transfer Notice. If such sale does not close within 90 days of the giving of the Transfer Notice on the terms set forth therein, then the Member giving the Transfer Notice may not sell its Interests to an Outsider without again complying with the terms of this **Section 10.2**.

(e)     Each Exercise Notice shall be accompanied by tender of the purchase price for the Economic Interests being purchased in the form and amount required under the Transfer Notice. Upon receipt thereof and upon the expiration of the 60-day period from the date of service of the Transfer Notice, and provided that the Offeror shall be obligated to sell

the Interests pursuant to this **Section 10.2**, the Offeror shall deliver to the purchasing Offeree(s) the appropriate transfer documents, if any, for the Interests being purchased, and the Company shall recognize and cooperate with such transfer.

Section 10.3. **Transfer of Economic Interests to Permitted Transferees**. Notwithstanding the foregoing, a Transfer of Economic Interests shall not be prohibited or restricted under this Agreement if made to the spouse, siblings, children (natural or adopted), grandchildren, or parents of a Member or to a trust or partnership or other flow-through entity for the benefit of a Member, his spouse, his siblings and/or his descendants (each such person or trust is a **"Permitted Transferee"**).

Section 10.4. **Additional Members**. The Manager shall have the right and authority to admit new Members (other than Permitted Transferees) and issue or sell Member Interests or Economic Interests in amounts and on such terms as the Manager deems advisable. If the Manager contemplates issuing Member Interests or Economic Interests to an Affiliate of the Company or a Member, then Manager may, but need not, first offer such Member Interests or Economic Interests to all of the Members (or if an Economic Interest is proposed for issuance, to all Economic Interest holders and Members) in accordance with their respective Interests.

Section 10.5. **Conversion to Successor Corporation**. If the Manager determines that it is in the best interests of the Company to operate the Business in corporate form, the Members and Economic Interest holders shall contribute their Interests in the Company to a corporation (the **"Successor Corporation"**) in exchange for stock interests in the Successor Corporation and shall take all other actions as may be necessary or desirable to cause the Business and/or the Company to be operated by the Successor Corporation and, if so requested, will do so in a way which will minimize and defer the federal income taxes for the Company and each of its Members. Stock in the Successor Corporation shall be issued in such a way so as to give each Member an ownership interest in the Successor Corporation as nearly equivalent to the ownership interest such Member had in the Company as practicable as determined by the Members, and each Member shall enter into a shareholder's agreement containing terms equivalent to the terms of this Agreement as determined by the Manager.

Section 10.6. **Liquidating Members**. At all times, Manager shall have the right, exercisable in accordance with the provisions of this **Section 10.6** to acquire all of the Interests of a Member (the **"Redemption Right"**). The following provisions shall be applicable to the exercise of the Redemption Right:

(a) In the event Manager desires to exercise the Redemption Right, it shall deliver a written notice of same to the Member in question (a **"Liquidation Notice"**). Any Member receiving a Liquidation Notice is referred to herein as a **"Liquidating Member"**. The Liquidation Notice shall state the Manager's determination of the Liquidation Value of the Liquidating Member's Interest.

(b)     Within twenty-one (21) days following receipt of a Liquidation Notice the Liquidating Member shall either accept the Liquidation Notice in which event Manager's determination of Liquidation Value shall be final and binding on both Manager and the Liquidating Member or elect Appraisal. If the Liquidating Member fails to object to a Liquidation Notice within twenty-one (21) days following receipt of a Liquidation Notice, Manager's determination of Liquidation Value shall be deemed to have been expressly accepted by the Liquidating Member.

(c)     If the Liquidating Member objects to Manager's determination of Liquidation Value in accordance with the foregoing procedures, then Liquidation Value shall be determined by appraisal (**"Appraisal"**) as follows:

(i)     Within thirty (30) days following Manager's receipt of the Liquidating Member's rejection of Manager's Liquidation Notice, Manager shall select an appraiser who shall not be an Affiliate of Manager and who shall be experienced in the appraisal and valuation of the Company's assets (the **"Appraiser"**). The Appraiser shall be directed to determine the price at which a willing buyer and a willing seller would agree to buy and sell respectively, all of the Company's assets. Such determination, net of usual and customary prorations, closing costs, reserves for post-closing expenses and other transfer expenses, which shall be based on the advice of counsel for the Company, shall be a conclusive and final determination of Liquidation Value, binding on both Manager and Liquidating Member.

(ii)     In the event the Liquidating Member elects to proceed with Appraisal, all costs of the Appraisal shall be borne solely by the Liquidating Member except that if the Liquidation Value determined by Appraisal is more than ten percent (10%) higher than the Liquidation Value determined by Manager, then the costs of Appraisal shall be paid by Manager.

(d)     At such time as the Liquidation Value has been determined in accordance with the applicable procedures prescribed under this **Section 10.6.**, the Manager and the Liquidating Member shall use their best efforts to consummate and/or cause the consummation of the Liquidating Member's sale of its entire Interest, at the price stipulated in the Liquidation Notice, as soon as practicable, but not later than twenty-one (21) days following the date of acceptance (or deemed acceptance) of such determination. The parties hereto acknowledge that in the event of any breach of this **Section 10.6**, the non-breaching party shall be entitled, in addition to any other remedies and damages available, to specific performance of the obligations set forth herein.

Section 10.7. **Drag-Along**. In the event the Manager determines that the Company should acquire other property or projects and should structure such acquisition or acquisitions so as to qualify for federal income tax purposes as a tax-deferred exchange of like-kind properties, the Manager shall be specifically empowered with the following rights:

(a) Manager shall be entitled to enter into any trust agreements or arrangements or exchange agreements as Manager may deem necessary or appropriate; and

(b) Manager shall have the right to reset the capital accounts, Capital Interests, Operating Interests and other Interests of each of the Members such that, following such transaction each of the Members continues to own an interest in the Company equivalent to what each Member would have had if the Company's assets were sold and the entire sales proceeds reinvested by each Member.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

Section 11.1. **Dissolution**.

(a) The Company shall be dissolved upon the occurrence of any of the following events:

(i) The expiration of the period fixed for the duration of the Company in **Article II** above;

(ii) By the written agreement of all of the Assessable Members;

(iii) The sale or other disposition of all or substantially all of the Company assets; or

(iv) Upon the occurrence of the death or Bankruptcy of any Member or any other event which terminates the continued membership of a Member in the Company, unless (x) there are at least two continuing Members and (y) continuing Members holding a majority of the Unrecovered Capital and a majority of the Capital Interests (excluding Interests held by the terminating Member) elect to continue the Company.

Section 11.2. **Winding Up, Liquidation and Distribution of Assets**.

(a) Upon dissolution, an examination shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last accounting through the date of dissolution. The Members shall immediately proceed to wind up the affairs of the Company.

(b) If the Company is dissolved and its affairs are to be wound up, the Members shall:

-20-

(i)     Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Members may determine to distribute any assets to the Members in kind);

(ii)    Allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with **Article VII** hereof; and

(iii)   Discharge all liabilities of the Company, including liabilities to the Members who are creditors, to the extent otherwise permitted by law, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company.

(c)     Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(d)     The Members shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

Section 11.3.     **Certificate of Dissolution**.   When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, a certificate of dissolution as required by the Act, shall be executed in duplicate and filed with the Delaware Secretary of State.

Section 11.4.     **Effect of Filing of Certificate of Dissolution**.   Upon the filing of certificate of dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for purposes of suits, other proceedings and appropriate action as provided in the Act.   The Members shall have authority to distribute any Company assets discovered after dissolution and take such other action as may be necessary on behalf of and in the name of the Company.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

Section 12.1.     **Notices**.   Any notice, demand, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally or if sent by reputable courier or by registered or certified mail to such party at his, her or its address of record maintained in the records of the Company.   Any such notice shall be deemed to be given when delivered or when delivery is refused.

Section 12.2.     **Law Governing**.   This Agreement and its interpretation shall be governed exclusively by the laws of the State of Illinois, without giving effect to the laws of such state regarding conflicts of laws.

Section 12.3. **Successors and Assigns**. This Agreement and all the terms and provisions hereof, shall be binding upon and inure to the benefit of the Members and their legal representatives, heirs, successors and assigns.

Section 12.4. **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute one instrument, provided however that the records of the Manager as to the membership in the Company shall be conclusive.

Section 12.5. **Severability**. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

Section 12.6. **No Third Party Beneficiaries**. The provisions set forth herein are solely for the benefit of the signatories hereto. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any other persons not signatories hereto.

Section 12.7. **Arbitration**. Each Member agrees that any dispute or claim arising out of or in connection with this Agreement, the Company or the Project, against or involving Manager, directly or indirectly, shall be submitted exclusively to arbitration in accordance with the then current rules of the American Arbitration Association. Any arbitration proceeding shall take place in Cook County, Illinois, pursuant to a separate arbitration agreement which shall provide that the substantive law of the State of Illinois shall be applicable to the dispute or disputes subject to the arbitration. The foregoing agreement and any arbitration determination may be enforced in the U.S. District Court for the Northern District of Illinois.

**In Witness Whereof,** the parties hereto have caused their signatures to be set forth below.

ASSESSABLE MEMBERS:

_____
David Baum
Capital Interest:  30%
Operating Interest:  30%
Opening Capital Contribution:  $0.00

_____
Douglas Baum
Capital Interest:  30%
Operating Interest:  30%
Opening Capital Contribution:  $0.00

_____
William Selonick
Capital Interest:  30%
Operating Interest:  30%
Opening Capital Contribution:  $0.00

_____
Janet Protas
Capital Interest:  10%
Operating Interest:  10%
Opening Capital Contribution:  $0.00

Manager accepts the appointment and agrees
to be bound by the terms of this Agreement.

**BAUM BROTHERS, L.L.C.**

By _____
Name ___ DAVID L. BAUM ___
Title ___ member ___

-23-